**CONSTRUCTION AGGREGATES COR-PORATION, Plaintiff-Appellant,**

v.

**HEWITT-ROBINS, INCORPORATED, Defendant-Appellee.**

No. 16124.

United States Court of Appeals Seventh Circuit.

Dec. 3, 1968.

Rehearing Denied Jan. 15, 1969.

Harlan L. Hackbert, Paul Noland, Don M. Peebles, Halbert O. Crews, Chicago, Ill., for plaintiff-appellant, Hackbert, Rooks, Pitts, Fullagar & Poust, Peebles, Greenberg, Keele, Lunn & Ford, Chicago, Ill., of counsel.

George B. Christensen, Douglas C. Moir, Edward J. Wendrow, Chicago, Ill., for defendant-appellee, Roy C. Megargel, Stamford, Conn., Winston, Strawn, Smith & Patterson, Chicago, Ill., of counsel.

Before CASTLE, Chief Judge, DUFFY, Senior Circuit Judge, and CUMMINGS, Circuit Judge.

CUMMINGS, Circuit Judge.

This action was brought to recover damages for breach of implied warranties, assertedly arising from a contract to design and furnish a conveyor system. After a month-long jury trial, judgment was entered on the verdict for the defendant, resulting in this appeal.

In April 1962, plaintiff Construction Aggregates Corporation ("CAC"), was the successful bidder on a contract[1] for the construction of dikes enclosing approximately 60 square miles of the Dead Sea, forming "evaporation pans" to be used to extract minerals from which pot-

---

1. On July 19, 1962, CAC formed a joint venture with Kaiser Engineers and Constructors, Inc. and Macco Corporation to perform this contract. Kaiser and Macco have assigned CAC their interest in the joint venture's claim against defendant.

ash could be produced. In order to construct the evaporation pans, it was necessary to move vast amounts of sand, gravel and rock from a large "borrow pit" to the Dead Sea contract site.

In May and June 1962, CAC representatives commenced discussing the conveyor system with Hewitt-Robins, Incorporated ("H-R"), with CAC exhibiting a proposed conveyor layout to H-R. CAC said that it would obtain some used conveyor equipment for the proposed system.

On May 25, 1962, H-R wrote CAC, offering for CAC's consideration the "basis for a cost-plus contract to design, furnish and provide the necessary erection supervision for the subject earth moving conveyor system."

A few weeks thereafter, CAC and H-R representatives conferred further, resulting in an exchange of letters dated June 15, 1962. CAC's letter said that its understanding was that H-R would "furnish the necessary engineering services," dividing the work between CAC and H-R "as may best suit the needs of the work." CAC's letter also said that it would give H-R preference in the purchase of equipment, but that CAC might purchase used conveyor equipment located in Little Valley, Utah, or other used equipment, to be utilized by H-R "to the greatest extent practicable in the design of the materials handling system."

On the same date, H-R wrote CAC it understood that CAC was accepting H-R's cost-plus letter of May 25, 1962, which was to form the basis of a contract, and stated that H-R would have engineers in CAC's offices within a few days to meet with CAC personnel "to determine the ultimate scheme so that design engineering can start." H-R reported its understanding that it would furnish products of its own manufacture at prices offered to original equipment manufacturers, without competitive bidding. H-R's letter also solicited a written agreement.

After further negotiations, H-R wrote CAC on June 20, 1962, that it would proceed with the project as a result of telephone agreements reached between certain officers of CAC and H-R and agreed to give additional discounts on its products. The letter thanked CAC for accepting H-R's proposal and concluded that H-R was looking forward to receiving CAC's purchase order, which was supposed to refer to H-R's letters of May 25, June 15 and June 20.

On June 27, 1962, H-R's Melrose Park, Illinois, office advised its New York office that CAC had assigned purchase order No. 16112 for the Dead Sea project, and that when the actual purchase order was received, Melrose Park would send it to New York for acceptance. The memorandum concluded as follows:

"This contract has been negotiated on the basis of a cost/plus letter written on May 25, 1962, by R. W. Eichenberger. Copies of this cost/plus letter and other pertinent correspondence have been sent to our Legal Department at Stamford for approval. It is not certain at this time whether Construction Aggregates will write their own version of the purchase order or whether they will accept our cost/plus letter. Upon clarification of this matter, it is suggested that the Legal, Contract Administration and Sales Departments get together to insure that we have the necessary terms and conditions included in our contract to minimize our risk and exposure."

On the same date, H-R issued a "contract authority" booking the work in question, although an H-R representative testified that the work would be stopped and the bookings reduced if the contract were not consummated.

On June 30, 1962, CAC sent H-R a letter the purpose of which was "to set forth the final agreement" between the two companies and asking H-R to send its confirmation to CAC. On July 5, 1962, H-R's Melrose Park office forwarded CAC's purchase order No. 16112, dated July 3, 1962, to its New York office, stating that H-R's representatives had "indicated to C.A.C. that this order is not accepted by H-R until one of our

corporate officers approves of all conditions and agreements."

On July 20, 1962, H-R sent CAC the executed acceptance copy of its purchase order No. 16112, but stating that H-R's acceptance was predicated on certain modifications, including a substitute warranty clause providing as follows:

"This warranty is in lieu of all other warranties expressed or implied.

The Seller warrants that machinery and/or machinery parts to be manufactured by it shall be free from defects in workmanship and material. Such warranty shall be binding upon the Seller for a period of one year from and after delivery of such equipment. If, at any time within such period, it is established to the Seller's satisfaction that any machinery, part or parts manufactured by the Seller were defective at time of delivery, the Seller shall promptly furnish replacements of or repair such items. It is understood that the Seller's liability under this warranty shall be limited to such repair or replacement. Rubber products manufactured by the Seller are not warranted for any specific length of time or measure of service. In the event of failure of such rubber products through defects, the Seller will at its option make replacement or refund, after charging for the service already rendered by the defective products; but in any event, the Seller's liability under this warranty is limited to the refund of the purchase price.

Any parts or equipment which the Seller does not manufacture shall be subject only to the warranties of the Seller's vendors.

Unless repairs to, alterations of, or work done on said equipment by the Purchaser, shall be specifically authorized in writing by the Seller, any warranty applicable thereto shall become null and void."

The July 20th letter also absolved H-R of liability "for any loss of profits or any indirect or consequential damages."

CAC made no written objection to the terms of this letter. But on July 31, 1962, its treasurer telephoned a representative of H-R, requesting a change only in the terms of payment set forth in said letter. These changes were accepted in an H-R letter dated July 31, 1962, referring to the previous letter setting forth H-R's conditions for acceptance. CAC made no objection to this reference or to the other terms H-R had imposed.

On July 31, 1962, CAC purchased three used conveyor systems from the Southern Pacific Company, which were incorporated into the Dead Sea project. Ninety per cent of the electric motors and other electrical equipment used by CAC was second-hand.

CAC commenced the construction of the conveyor system in Israel in late October or early November of 1962. The plant did not operate satisfactorily. In July 1963, at the request of CAC, H-R sent two of its employees to inspect the project and to offer remedial suggestions. Both parties have continued to blame each other for the unsatisfactory working of the system. It is unnecessary for us to affix the blame. However, CAC admitted that by September 1963, all of its mechanical operation problems were under good control.

CAC tried this case on the theory that H-R was liable for breaches of implied warranties that the conveyor system was fit for the intended purpose, including the engineering design and the component parts. H-R's position was that the jury was entitled to find that its letter of July 20, 1962, limiting warranties and liability for any breach, was a part of the contract between the parties, so that there was no implied warranty as to either engineering services or parts. The district court permitted the jury to find that H-R's letter of July 20, 1962, constituted a counter-offer that was accepted by CAC, thus justifying a verdict for defendant. We affirm.

CAC first argues that the district court should have decided as a mat-

ter of law that a contract had been formed on or before June 30, 1962. The resolution of that question "turns upon the proper conclusions to be drawn from a series of letters, particularly of a commercial character, taken in connection with other facts and circumstances," so that it was properly referable to the jury. Rankin v. Fidelity Insurance, Trust & Safe Deposit Co., 189 U.S. 242, 252–253, 23 S.Ct. 553, 47 L.Ed. 792; 3 Corbin on Contracts (1963), § 554, at pp. 226–227. As Judge Friendly recently put it in Meyers v. Selznick Company, 373 F.2d 218, 223 (2d Cir.1966), the question of the existence of the terms of a contract should be submitted to a jury unless a reasonable man can determine the issue in only one way. When H-R's Melrose Park office received CAC's purchase order, CAC was told that the order would not be accepted until one of H-R's corporate officers approved all the conditions and agreements. On July 20, 1962, H-R wrote CAC about the purchase order and advised that acceptance was "predicated on the following clarifications, additions or modifications to the order," including the substitute warranty clause quoted in the foregoing state-ment of facts. Since H-R's acceptance was "expressly made conditional on assent to the additional or different terms" contained in its July 20th letter, the exception in the last clause of Section 2–207(1) of the Uniform Commercial Code was clearly applicable.[2] Hence the district court was justified in permitting the jury to treat that letter as a counter-offer.[3]

 Section 2–207(3) recognizes that the subsequent conduct of the parties can establish a contract for sale. Since CAC's July 3 purchase order and H-R's July 20 counter-offer did not in themselves create a contract, Section 2–207(3) would operate to create one because the subsequent performance by both parties constituted "conduct by both parties which recognizes the existence of a contract." Such a contract by operation of law would consist only of "those terms on which the writings of the parties agree, together with any supplementary terms incorporated under other provisions of this Act." There having been no agreement on the warranty terms, the implied warranties provided in Sections 2–314 and 2–315 (Ill. Rev.Stats.1967, ch. 26, §§ 2–314 and 2–

---

2. Section 2–207 provides (Ill.Rev.Stats. 1967, ch. 26, § 2–207):

"**Additional Terms in Acceptance or Confirmation.**

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

"(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

"(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act."

3. In effect, the jury could conclude that H-R was plainly telling CAC "I will not accept your offer until you assent to the following: * * *." See Roto-Lith, Ltd. v. F. P. Bartlett & Co., 297 F.2d 497, 500 (1st Cir. 1962). There the court implied a condition of acceptance instead of hewing strictly to the requirement of Section 2–207(1) that conditional acceptance should be expressed in words. See Smith-Hurd Illinois Statutes Annotated, ch. 26, § 2–207, (1967 Supp.) p. 15; 57 N.W.U.L.Rev. 477, 479 (1962). But H-R's July 20th letter expressly stated its conditional acceptance of CAC's purchase order, thus satisfying the *Roto-Lith* critics.

315) would then ordinarily become applicable. See Hawkland, A Transactional Guide to the Uniform Commercial Code (1964) p. 18. Here, however, there is no occasion to create a contract by operation of law in default of further actions by the negotiating parties, for CAC can be said to have accepted the terms of H-R's counter-offer.[4] CAC sought a change only in the payment terms of the counter-offer, raising no objection to H-R's other modifications of the original purchase order. H-R granted CAC's requested change in a letter of July 31 and could reasonably have assumed that CAC's single objection was an acquiescence in the remaining terms of the counter-offer. CAC did not object to this implication in H-R's July 31st letter reference to the terms of its counter-offer and therefore CAC could appropriately be held to the terms of the July 20th letter. Cf. Section 2–201(2) (Ill.Rev.Stats.1967, ch. 26, § 2–201(2)). In this setting, the jury could determine that CAC had accepted H-R's July 20 terms.[5] See 1 Illinois Practice, Uniform Commercial Code Forms Annotated (Davenport and Henson eds., 1967), p. 55.

As noted earlier, this suit was for breach of implied warranty of fitness for purpose. However, H-R's July 20th letter contained only a limited express warranty and was "in lieu of all other warranties expressed or implied." Under the Commercial Code, this was sufficient to exclude implied warranties of fitness. See Ill.Rev.Stats.1967, ch. 26, § 2–316; see also L. O. Whybark Co. v. Haley, 37 Ill.App.2d 22, 184 N.E.2d 798 (1962) (a pre-Code case). Since the general verdict is supportable on the theory that the July 20th H-R letter was binding on CAC and negated implied warranties of fitness, it is unnecessary to discuss CAC's assertions that H-R breached such warranties. In any case, our review of the record convinces us that the jury would have been warranted in resting its verdict, for example, on CAC's failure to install and supervise properly the machinery supplied by H-R, CAC's failure to advise H-R accurately of the nature of the work which the conveyor system was expected to perform, or the inexperienced native work force employed by CAC. We express no views on these questions other than to state that the jury could properly have resolved the sharply disputed testimony on these and other factual questions in favor of H-R.

■ CAC also contends that it was improper for the district court to send the written instructions to the jury[6] without a cautionary instruction to "consider these instructions as a whole, not picking out one instruction and disregarding the others." Even though it would have been preferable to give such an instruction, we cannot presume that the jury responded to a few instructions and disregarded others. No case has been brought to our attention holding that any possible error in this regard requires reversal under Section 2111 of the Judicial Code (28 U.S.C. § 2111) or Rule 61 of the Federal Rules of Civil Procedure, and the changes that the trial court made in CAC's tendered Instruction No. 1 were too slight to prejudice it.

The judgment of the district court is affirmed.

---

4. Hawkland indicates that subsequent negotiations with respect to the terms of the counter-offer may take the contract out of Section 2–207(3). Id. at 21.

5. Subsequently CAC accepted and paid for H-R's goods and services. The second holding of Roto-Lith, Ltd. v. F. P. Bartlett & Co., 297 F.2d 497, 500 (1st Cir. 1962), is that under the Commercial Code acceptance of goods with knowledge of a counter-offer binds the purchaser to its terms. Whether or not that holding is correct, CAC's treasurer's phonecall of July 31st and H-R's written acceptance of the only changes suggested by CAC are enough to render Section 2–207(3) inapplicable.

6. This practice was sanctioned in United States v. Standard Oil Company, 316 F. 2d 884, 896 (7th Cir. 1963).