ARMCO STEEL CORPORATION,
Appellant,

v.

ISAACSON STRUCTURAL STEEL
COMPANY, Appellee.

ISAACSON STRUCTURAL STEEL
COMPANY, a Division of Isaacson
Corporation, Appellant,

v.

CHRISTIANSON CONSTRUCTION
CO., INC., Appellee.

CHRISTIANSON CONSTRUCTION CO.,
INC., Cross-Appellant,

v.

ISAACSON STRUCTURAL STEEL
COMPANY, a Division of Isaacson
Corporation, Cross-Appellee.

Nos. 3138, 3139 and 3140.

Supreme Court of Alaska.

May 9, 1980.

Carl J. D. Bauman, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellant Armco.

Hugh G. Wade, Barokas & Martin, Anchorage, for appellee and cross-appellant Christianson.

John M. Conway and Robert J. Dickson, Atkinson, Conway, Young, Bell & Gagnon, Anchorage, for appellant and cross-appellee Isaacson.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

BURKE, Justice.

This case involves two appeals and a cross-appeal from a judgment entered by the superior court in a suit for breach of contract. Isaacson Structural Steel Corporation brought an action against Christianson Construction Company to recover the contract price for steel that Isaacson had purchased, fabricated and supplied to Christianson. Christianson counterclaimed for damages it had suffered because of Isaacson's late delivery of the steel. After a year of litigation between Isaacson and Christianson, Isaacson filed a third-party action against Armco Steel Corporation, Isaacson's steel supplier, claiming that Armco was responsible for any delay in delivery.

The superior court found that Isaacson was entitled to recover the price of the steel from Christianson, $274,827.68, plus interest. That amount was offset by Christianson's recovery of $201,668.60, plus costs and attorney's fees, from Isaacson for damages due to late delivery. The net judgment in favor of Isaacson was $33,835.45. The court further found that Isaacson was entitled to recover $183,668.60, plus interest, from Armco for delay damages, in addition to the costs and attorney's fees incurred by both Isaacson and Christianson, for a total judgment against Armco of $303,347.93. We affirm the judgment against Christianson in favor of Isaacson, and we reverse the judgments against Armco and Isaacson.

### Isaacson's Third-Party Claim
### Against Armco

On July 16, 1973, Christianson entered into a contract with the State of Alaska for the construction of the Nenana River Bridge at Windy, Alaska. State specifications called for specialized steel for the structural box girder and floor beam portions of the bridge. Isaacson, a Seattle-based steel fabricator, submitted a bid to Christianson on June 27, 1973, for the structural steel required for the bridge. Isaacson's bid was accepted on approximately August 2, 1973. The Isaacson-Christianson contract [1] required delivery of the steel to Cantwell, Alaska, by February 20, 1974. This was the latest date Christianson believed would permit construction of the bridge from the ice, and Christianson wished to save the added cost of a work bridge, which would be required if the river thawed.

When Isaacson entered into its contract with Christianson, it apparently relied on certain communications with Phoenix Steel Company regarding the supply of the specially fabricated steel required for the project. Because of increasing demand for steel and consequent problems in obtaining timely shipments of steel, Isaacson placed two orders. It first placed an order with Phoenix for the specialized steel on August 23, 1973. Isaacson then placed an order with Armco for the same type of steel on August 30, 1973. Because of the February 20, 1974, delivery commitment to Christianson, the delivery date was a primary factor in Isaacson's negotiations with steel producers. Isaacson therefore planned to cancel whichever order produced the later delivery date.

On September 17, 1973, Armco advised Isaacson that it had scheduled shipment from its Houston mill for the week of December 3, 1973. Armco's shipping dates were earlier than those which Phoenix had quoted Isaacson. Accordingly, Isaacson forwarded its written purchase order for the steel to Armco on September 18, 1973. After receiving additional verbal assurances from Armco of a December delivery, Isaacson cancelled the Phoenix order on October 5.

On October 15 and 23, 1973, Armco sent acknowledgments to Isaacson.[2] On December 18, 1973, Armco advised Isaacson by telephone that the order was scheduled for shipment the week beginning January 6, 1974. On January 2, 1974, Armco's Los Angeles office wrote Isaacson indicating the shipping status of the order. Armco completed the Isaacson order in four separate shipments. The first was on December 31, 1973; the second, on January 2, 1974; the third, on January 21, 1974; and the final shipment, on February 18, 1974.

Isaacson commenced fabrication after the final shipment arrived in Seattle on March 4, 1974, and expected to ship the steel to Christianson on April 4 and April 6, 1974. On April 1, 1974, however, a strike shut down the Isaacson plant. The strike ended on May 20, but the work force did not return completely until about June 1, 1974. The steel arrived in Cantwell between June 4, 1974, and August 22, 1974. The trial court concluded that, if Armco had delivered the steel on time, Isaacson could have completed the order in time to ship prior to the strike. The court further concluded, however, that, even if Armco had delivered on time, Isaacson could not have shipped the steel in time to permit winter erection from the ice. The court based its conclusion on the fact that off-ice construction would have been impossible due to the recurrence of a lead in the ice. The steel arrived too late in the summer to permit summer construction. Christianson, therefore, decided to erect the steel from the ice in the winter of 1974–1975, one year behind schedule.

---

1. The terms of that contract are the subject of Isaacson's claim against Christianson and Christianson's counterclaim.

2. Separate acknowledgements were sent for the A–572 carbon steel and for the A–514 alloy steel because they required different processing and were treated by the mill as separate, but related, orders.

Christianson withheld approximately $280,000 from Isaacson for the price of the steel, claiming damages from the delayed delivery. It asserted these damages as a defense to Isaacson's action to recover the purchase price. Isaacson commenced its action on February 25, 1975. Prior to the commencement of the action, Christianson notified Isaacson by letter of its claim of damages predicated on delay of delivery.[3] Armco, however, received no notice of breach. Isaacson paid Armco's full purchase price of approximately $79,000 upon receipt of Armco's shipments in 1974. The filing of the third-party complaint against Armco on February 6, 1976, was the first information Armco received about a suit arising out of the transaction.

■ On appeal, Armco alleges numerous grounds for reversal. We address only one of the issues raised by Armco since we find it to be dispositive: Did the superior court err in holding that lack of prejudice to Armco excused Isaacson's failure to notify Armco of breach, as required by AS 45.05.-174(c)(1)?[4] We hold that Isaacson's failure to notify Armco of the breach was not excused and that this failure discharges Armco of any liability.[5]

The superior court concluded that the Armco-Isaacson contract was formed pursuant to AS 45.05.062(c).[6] Accordingly, it found the terms of AS 45.05 to be implied terms of the contract. Among these terms is the notice requirement contained in AS 45.05.174(c)(1).[7]

At no time did Isaacson give Armco notice of breach as required by AS 45.05.-174(c)(1).[8] Isaacson was notified of Chris-

**3.** Christianson's letters to Isaacson on July 2 and July 16, 1974, and Isaacson's responses on July 11, July 30, and December 9, 1974, were found by the court to have satisfied any notice requirements. That finding is not challenged on appeal.

**4.** AS 45.05.174(c)(1) provides: "If a tender has been accepted, . . . the buyer must, within a reasonable time after he discovers or should have discovered a breach, notify the seller of the breach or be barred from any remedy . . . ." This section is essentially identical to U.C.C. § 2–607(3)(a).

**5.** This issue may be resolved without reference to the other issues presented by Armco. Armco contends that its order acknowledgment constituted the contract between the parties. The only term in the acknowledgment relating to notice required not only notice of claims but "prompt" notice: "CLAIMS BY BUYER. Claims by Buyer must be made promptly upon receipt of shipments and Seller given an opportunity to investigate. . . ." AS 45.05.-174(c)(1) merely requires notice within a "reasonable time." Since we find that Isaacson failed to satisfy the statute's more lenient notice requirement, we do not inquire into the result under the terms of Armco's asserted contract.

**6.** AS 45.05.062 provides:

*Additional terms in acceptance or confirmation.*

(a) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(b) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless

(1) the offer expressly limits acceptance to the terms of the offer;

(2) they materially alter it; or

(3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(c) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In this case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under other provisions of this chapter.

This section is essentially identical to U.C.C. § 2–207.

**7.** All of the states involved in this contract have adopted U.C.C. § 2–607: Texas, Tex.Bus. & Com.Code Ann. § 2–607 (Vernon); Washington, Wash.Rev.Code Ann. § 62A.2–607; and Alaska, AS 45.05.174. Therefore no choice of law problems are presented by this issue.

**8.** The applicability of the notice requirement to a breach of delivery terms is not in dispute in this case. Such an application of U.C.C. § 2–607(3)(a), the counterpart of AS 45.05.-174(c)(1), is well established. *See, e. g., Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,*

tianson's intention to hold it in breach of the Christianson-Isaacson contract as early as July 1974. Armco, however, did not receive any communication from Isaacson regarding any problem arising from the Armco-Isaacson contract until Isaacson filed its third-party complaint against Armco on February 6, 1976. The trial court, while suggesting that absence of prejudice is not conclusive, did in fact rely solely on that factor in deciding that Isaacson's failure to give notice was excused.[9]

On its face the language of AS 45.05.-174(c)(1) allows for no alternative to timely notice. The statute states that the "buyer *must . . .* notify the seller of the breach or be barred from *any* remedy . . . ." (Emphasis added.) It provides *for no excuse from notice such as lack of prejudice.*

Several of our decisions support a strict construction of AS 45.05.174(c)(1). In *Prince v. LeVan,* 486 P.2d 959 (Alaska 1971), we pointed out that "a buyer who has accepted goods . . . has no remedy at all unless he notifies the sellers of breach within a reasonable time as required by AS 45.05.174(c)(1)." *Id.* at 963 (footnotes omitted). Similarly, in *A & G Construction Co. v. Reid Brothers Logging Co.,* 547 P.2d 1207 (Alaska 1976), a construction company failed to object to the late delivery of construction materials. We held: "Since A &

G accepted the goods, and since there was no notification to Reid that the deliveries were insufficient or late, A & G must pay for the accepted goods at the contract price, and A & G is barred from any subsequent remedy . . . ." *Id.* at 1219 (footnotes omitted). Our recent decision in *Kelly v. Miller,* 575 P.2d 1221 (Alaska 1978), also supports strict construction of the notice requirement. In *Kelly* we stated:

The UCC does not cover every aspect of contract law and where a situation arises which calls for application of legal or equitable principles not displaced by Code provisions, courts are free to use these supplemental principles. AS 45.05.-006. However, where the UCC does provide a specific and complete remedy for an actionable wrong, we will view its provisions as exclusive. *See Prince v. LeVan,* 486 P.2d 959, 962 (Alaska 1971) (where specific UCC provisions are available to deal with a case, they should be applied).

*Id.* at 1224 (footnote omitted). Although *Kelly* refers to remedies, its rationale applies equally to the notice requirement in AS 45.05.174(c)(1).

Isaacson has not cited any case law supporting the trial court's decision that lack of prejudice to the seller excuses the buyer's failure to give notice.[10] The cases from

---

532 F.2d 957, 972–73 (5th Cir. 1976); 2 R. Anderson, Anderson on the Uniform Commercial Code § 2–607:9, at 207, § 2–607:13, at 211 (2d ed. 1971); 3 A. Squillante & J. Fonseca, Williston on Sales § 22–11, at 318–19 (4th ed. 1974).

9. The trial judge commented as follows:
The evidence is fairly clear I think that Armco has not been prejudiced in defending itself here by virtue of any delay. While I'm not prepared to say that an absence of prejudice as between merchants is conclusive, nevertheless because of the peculiar circumstances of this case, and because the only adverse effect of a breach that Isaacson could suffer would be the necessity of responding to Christianson in damages, taking all of these facts into account, I'm not prepared to say that Isaacson has lost its case by virtue of the failure to give notice. Although I think that's an extremely close question. And I'm not convinced that a strict rule of notice or no

remedy in every case, regardless of prejudice and regardless of surrounding circumstances, would not do justice in as many cases as a more flexible rule would do.

. . . So what I find is that there has been a failure by Isaacson to comply with the statute, but that failure is in effect excused by an implicit condition that the failure to give notice must prejudice the opposite side, that in this case there was no prejudice and therefore the duty to give notice was excused.

10. Isaacson seeks to rely on *Bengford v. Carlem Corp.,* 156 N.W.2d 855 (Iowa 1968), in which the court held that an injured boy was not precluded from recovery because of his failure to notify a tractor manufacturer of an alleged breach of the implied warranty of fitness. *Bengford,* however, is inapposite because it involved personal injury to a third-party beneficiary of a warranty. *See* notes 13 & 15 *infra.*

other jurisdictions that discuss the relevance of prejudice to the seller in connection with the notice requirement of U.C.C. § 2–607, the counterpart of AS 45.05.-174(c)(1), do so in the context of determining the *reasonableness* of the time of giving notice. *See, e. g., Pritchard v. Liggett & Myers Tobacco Co.,* 295 F.2d 292 (3d Cir. 1961). In *Pritchard* the court commented: "The question of *reasonableness* must be determined from the circumstances in the individual case. . . . One of the factors to be considered is, did the delay in giving notice or its form prejudice the seller?" *Id* at 298 (emphasis added). Where *no* notice is given, however, the question of reasonableness does not arise. While there is authority supporting the proper consideration of lack of prejudice in evaluating the *reasonableness* of notice, we believe the superior court erred in finding that the lack of prejudice to the seller excused Isaacson's absolute failure to give notice.

Strict adherence to the notice requirement is in keeping with one purpose of the Code set forth in Comment 4 to U.C.C. § 2–607: "to defeat commercial bad faith."[11] This comment emphasizes both notification to the seller that "the transaction is still troublesome and must be watched" and the importance of opening "the way for normal settlement through negotiation." U.C.C. § 2–607, Official Comment 4.[12] The purpose behind the notice requirement of U.C.C. § 2–607 was discussed in *Eastern Air Lines, Inc. v. McDon-nell Douglas Corp.,* 532 F.2d 957, 972 (5th Cir. 1976):

As Comment 4 to section 2–607 indicates, the purpose of notice is not merely to inform the seller that his tender is nonconforming, but to open the way for settlement through negotiation between the parties. In the words of the California Supreme Court, "the sound commercial rule" codified in section 2–607 also requires that a seller be reasonably protected against stale claims arising out of transactions which a buyer has led him to believe were closed. *Pollard v. Saxe & Yolles Development Company,* 1974, 12 Cal.3d 374, 115 Cal.Rptr. 648, 525 P.2d 88 . . . . Early warning permits the seller to investigate the claim while the facts are fresh, avoid the defect in the future, minimize his damages, or perhaps assert a timely claim of his own against third parties.

The overriding purpose of the notice requirement is to encourage consistent business practices and early settlement of disputes. We believe this purpose is best served by strict adherence to the literal requirements of the statute.

■ In reaching this conclusion, we reject Isaacson's contention that the complaint it filed in its third-party action against Armco satisfied the notice requirement of AS 45.05.174(c)(1). There are very few cases which deal with this issue, and while a few courts have found pleadings in a lawsuit to be adequate notice under U.C.C. § 2–607,[13] there are also cases to the

---

11. Comment 4 provides:

The time of notification is to be determined by applying commercial standards to a merchant buyer. "A reasonable time" for notification from a retail consumer is to be judged by different standards so that in his case it will be extended, for the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.

The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer . . . . The notifi-

cation which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

U.C.C. § 2–607, Official Comment 4.

12. While Comment 4 to U.C.C. § 2–607 sets forth a somewhat less stringent standard for cases involving a retail consumer, this case involves a commercial application of the statute. The superior court's conclusion that Armco and Isaacson are "merchants" and therefore subject to the commercial application of AS 45.05.174(c)(1) is undisputed.

13. *See, e. g., Pace v. Sagebrush Sales Co.,* 114 Ariz. 271, 560 P.2d 789, 792 (1977); *Davidson*

contrary.[14] The commentators, however, *uniformly* reject the view that pleadings satisfy the notice requirement. One treatise, for example, comments as follows:

> The notice of the breach of warranty that is contemplated by § 2–607(3) does not contemplate the buyer delivering a summons and complaint to the seller as constituting notice. Section 2–607(3) provides no remedy for a breach of warranty until the buyer has given notice, therefore, summons and complaint cannot constitute notice.

> . . . . .

> Except for one decision [*Silverstein v. R. H. Macy & Co.*, 266 A.D. 5, 40 N.Y.S.2d 916 (1943)], which equated the bringing of an action against the seller for breach of contract with sufficient notice, the general rule was, even under the Uniform Sales Act, that notice is a condition precedent to the buyer's right of action against the seller.

> . . . . .

> Like the Uniform Sales Act, the Code does not permit the filing of the law suit to constitute notice. . . .

> As a commonsense rule, it must be said that it is not within the spirit of fair play and liberal interpretation to consider the commencement of an action as the giving of notice under the Code.

3 A. Squillante & J. Fonseca, Williston on Sales § 22–11, at 308–10, 312–13 (4th ed. 1974) (footnotes omitted). *See also id.* at 301–02; *id.* § 22–11, at 53 (Cum.Supp.1978); 2 R. Anderson, Anderson on the Uniform Commercial Code § 2–607:28 (2d ed. 1971); Annot., 17 A.L.R.3d 1010, 1111 (1968).

We believe the commentators represent the better view. We therefore affirm the superior court's ruling that Isaacson's third-party complaint did not constitute notice within the meaning of AS 45.05.174(c)(1).[15] We agree with the trial court that to conclude that a complaint serves as notice would defeat one of the primary purposes of the notice requirement—settlement of claims and avoidance of litigation.

▮ The result produced by this decision is not as harsh as it may seem, for even if the pleadings were found to constitute notice, we believe that in this case such notice was not given within a reasonable time. The breach occurred in December, 1973, when Armco failed to deliver the steel as scheduled. As early as July 1974 Isaacson had notice that Christianson was claiming damages based on late delivery.[16] Armco, however, did not learn of any problems with the sale until Isaacson's complaint was filed in February 1976, over two years after

*v. Wee*, 93 Ariz. 191, 379 P.2d 744, 749 (1963). In a similar case, *Hampton v. Gebhardt's Chili Powder Co.*, 294 F.2d 172 (9th Cir. 1961), the Ninth Circuit Court of Appeals, applying the California version of the Uniform Sales Act, held that "notice otherwise given within a reasonable period of time can . . . follow commencement of suit provided it is subsequently and properly pleaded." *Id.* at 174.

Although *Pace* did involve breach in a commercial setting, both *Davidson* and *Hampton* involved actions for breach by a consumer who had suffered personal injuries as a result of the breach. It is well accepted that the notice requirements are to be applied less strictly in a noncommercial setting. *See* U.C.C. § 2–607, Official Comment 4, quoted in note 11 *supra*; 3 A. Squillante & J. Fonseca, Williston on Sales § 22–11, at 299–301 (4th ed. 1974) (suggesting that courts which find the filing of a complaint to be sufficient notice do so to avoid harsh results in cases involving personal injury and property damage).

**14.** *See, e. g., Lynx, Inc. v. Ordnance Products, Inc.*, 273 Md. 1, 327 A.2d 502, 514 (1974); *Solomon & Son v. Thomas*, 45 Luzerne Leg.Reg.R. 269 (Pa.1955) (holding summarized in 3 A. Squillante & J. Fonseca, Williston on Sales § 22–11, at 313 n. 60 (4th ed. 1974)).

**15.** We note that this decision is reached in a case involving merchants who are litigating a commercial claim. *See* note 12 *supra*. A comparably strict application of the notice requirement of AS 45.05.174(c)(1) may not be appropriate in a case involving a consumer's claim of breach. *See* note 13 *supra*. *See generally* Phillips, *Notice of Breach in Sales and Strict Tort Liability Law: Should There Be a Difference?*, 47 Ind.L.J. 457 (1972). An obligation of good faith is created by AS 45.05.024 & 45.05.-040(a)(2), and, even in the commercial setting, if one party has demonstrated a lack of good faith, it might be appropriate to relax the notice requirement somewhat.

**16.** *See* note 3 and accompanying text *supra*.

the actual breach and a year and a half after Isaacson learned of Christianson's claim. Although the *reasonableness* of notice is generally a question of fact, where there is undisputed evidence of an unduly long delay in giving notice, a court may find that the notice was unreasonable as a matter of law. *Jarstad v. Tacoma Outdoor Recreation, Inc.*, 10 Wash.App. 551, 519 P.2d 278, 283–84 (1974) (notice given fourteen months after discovery of inventory shortage in connection with sale of business was unreasonable as a matter of law).

The nature of Armco's alleged liability in this case is purely contingent, depending solely on a determination that Isaacson is liable to Christianson. In such a situation it may be that a reasonable time for giving notice should be measured not from the time of breach (December 1973) but from the time Isaacson learned of Christianson's claim (July 1974).

The superior court found in this case that Isaacson's duty to give notice to Armco did not arise until Isaacson became aware of Christianson's intent to claim damages for breach of contract. There appear to be very few cases and little commentary discussing the notice requirement in the context of a third-party claim.[17] In one case, however, the court found, without discussion, that a buyer had satisfied the notice requirement when it notified the supplier soon after buyer received complaints about the product from its customer. *See Chemco Industrial Applicators, Co. v. E. I. duPont de Nemours & Co.*, 366 F.Supp. 278, 286 (E.D.Mo.1973) (applying Arkansas law identical to U.C.C. § 2–607). In another case the court found that the plaintiff automobile manufacturer had failed to give reasonable notice to the defendant supplier. *Columbia Axle Co. v. American Automobile Insurance Co.*, 63 F.2d 206 (6th Cir. 1933) (applying Ohio version of Uniform Sales Act § 49). In that case the purchaser of an automobile was injured because of a defective axle, and he sued the automobile manufacturer. The manufacturer, however, did not notify the axle supplier of the problem until six months after the manufacturer first received notice of the complaint and one month after the purchaser's lawsuit was filed. *Id.* at 207. When the manufacturer subsequently sought indemnity from the supplier, the court found that the notice requirement was applicable to such a situation and that, as a matter of law, the notice given was not reasonable. Therefore, no recovery was allowed. *Id.* at 207–08. *See also Redman Industries v. Binkey*, 49 Ala. App. 595, 274 So.2d 621, 624–25 (1973) (third-party defendant entitled to notice within reasonable time of discovery of breach); *Eaton Corp. v. Wright*, 281 Md. 80, 375 A.2d 1122, 1127–28 (1977) (recognizing notice issue in third-party situation but finding it unnecessary to reach the issue because plaintiff had failed to establish a prima facie case of breach). Even assuming that reasonableness is to be measured from July 1974, when Christianson notified Isaacson of its dissatisfaction, rather than from the time of breach, we concluded that it was unreasonable not to give notice until February 1976.

■ We also reject Isaacson's contention that it had no reason to notify Armco of the breach until the trial court rendered its decision finding Isaacson liable to Christianson for damages. Isaacson argues that it was not aware of the reasons for Armco's delays in delivery until May 1976, and that it therefore had no knowledge of the breach which occurred in December 1973. Failure to deliver as scheduled, however, was a breach of the contract, whether or not it might later be found to have been an *excused* breach. AS 45.05.174(c)(1) does not suggest that the buyer should know the cause of the delay before giving notice. Comment 4 to U.C.C. § 2–607 clearly states

---

**17.** There are numerous cases involving consumer goods and personal injury which deal with whether the injured person, as the third-party beneficiary of a warranty, is required to comply with the notice requirements before suing the manufacturer. *See, e. g., Frericks v. General Motors Corp.*, 278 Md. 304, 363 A.2d 460, 463–65 (1976) (no notice required); *Prutch v. Ford Motor Co.*, 574 P.2d 102, 110 (Colo.App. 1977) (notice required). Such cases, however, provide little guidance on how the notice requirement should be applied to indemnity claims in a commercial setting.

that the notice need not be a "clear statement of all the objections that will be relied on by the buyer." It "need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." As stated by Judge Learned Hand in *American Manufacturing Co. v. United States Shipping Board Emergency Fleet Corp.*, 7 F.2d 565 (2d Cir. 1925):

> The notice "of the breach" required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of buyer's claim that they constitute a breach. The purpose of the notice is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning.

*Id.* at 566.

Isaacson knew of the breach in December 1973, and it knew in July 1974 that the transaction was "still troublesome." At the very least, AS 45.05.174(c)(1) required Isaacson to notify Armco within a reasonable time after July 1974, but Isaacson did not. We find that Isaacson, having failed to comply with the notice requirement of AS 45.05.174(c)(1), is barred from any remedy against Armco. Accordingly, the judgment against Armco is reversed.

### Isaacson's Claim Against Christianson and Christianson's Counterclaim

Christianson entered into its contract with the state to build the bridge on July 16, 1973. The day before Christianson submitted its bid to the state, Isaacson had given Christianson a telephone quotation of $396,000 for the manufacture of special low temperature steel that state specifications required for the bridge. After receiving notification of the contract award, Christianson asked Isaacson to submit a written proposal containing the specifics of the telephoned quotation. Christianson at that time did not inform Isaacson that Christianson had been awarded the contract. Isaacson prepared a "Proposal Contract" and mailed it to Christianson on July 16, 1973. The "Proposal Contract" contained conditions on the reverse side including a force majeure clause and a limitation of consequential damages clause.[18]

On July 27 Christianson called Isaacson and asked what the price would be F.O.B. Cantwell, rather than Seattle as had been specified in the proposal. On July 30 Isaacson called Christianson and quoted a new contract price of $420,000 with the Cantwell delivery and a change in the pier nosing height. On August 2 Christianson informed Isaacson by telephone that the job was theirs for $408,000, and Isaacson agreed to that price.

After the August 2 telephone conversation, Christianson sent Isaacson a letter confirming the telephone call.[19] Isaacson sent Christianson an acknowledgment dated

---

**18.** The force majeure clause reads as follows:

The Seller shall not be liable for failure to perform this contract in whole or in part if such failure is due to strikes, work stoppages or slowdowns, differences with workmen, local labor shortages, accidents, fire, storms, flood, riots, war, failure of equipment, delays in transportation, shortages in cars, shortages of fuel, power or materials, laws, regulations or requirements of any government or government agency, acts of God, or other contingencies beyond the control of the Seller.

The limitation of consequential damages clause reads as follows:

Shipping and completion terms are based on conditions prevailing at the time of this contract. Every effort will be made to meet these terms, but shipments or services provided within a reasonable time thereafter shall be construed as in compliance with the contract. IN NO EVENT SHALL SELLER BE LIABLE FOR ANY CONSEQUENTIAL DAMAGES OR CLAIMS FOR LABOR OR OTHER CHARGES RESULTING FROM FAILURE OF OR DELAY IN DELIVERY.

**19.** The letter read, in pertinent part:

In accordance with our telephone conversation today, we confirm our award to you for the Structural Steel items for the referenced project in the amount of $408,000.00 F.O.B. railcars, Cantwell, Alaska. As discussed, delivery time is of the utmost importance to us and this award is based on delivery from Seattle in late January 1974.

. . . . .

Our formal purchase order will follow. Please accept this letter as a notice to proceed with material commitments.

August 3, 1973. In its letter Christianson stated that a formal purchase order would follow. That order, however, was prepared but never sent. On the order that was prepared, a question mark was typed next to the term "Required Delivery Date."

After receiving Christianson's letter, Isaacson telephoned Christianson and stated that delivery was predicated on mill performance, *i. e.*, Armco's performance, and that Isaacson, therefore, could not promise delivery in Seattle in late January 1974, the delivery date specified in Christianson's letter. Isaacson did not receive all the steel from Armco until March 1974. There was then a strike at Isaacson's plant from April 1, 1974, through May 20, 1974, and the steel did not arrive in Cantwell until August 1974.

The trial court concluded that an oral contract was entered into by Isaacson and Christianson by telephone on August 2, 1973, and that the proposal sent by Isaacson to Christianson on July 16, 1973, served merely as the basis for further negotiation. Since the court considered the proposal to be merely an offer that was never accepted, it found that the terms of that offer, including the force majeure clause and the limitation of consequential damages clause,[20] did not become part of the contract. The terms of the oral contract, as confirmed by the parties' correspondence, were found by the court to provide for a price of $408,000, F.O.B. Cantwell, and delivery in late January 1974. The court further concluded that Isaacson knew of Christianson's "crucial need" to receive the steel in January and that the delivery date agreed to in the oral contract was "neither expressly nor by implication made condi-

tional on Isaacson's timely procurement of steel from a supplier." Finally the court found that the original contract was modified to provide for delivery by February 20, 1974.

■ On appeal Isaacson contends that the trial court erred in failing to find that the "Proposal Contract" was an offer, the terms of which were accepted by Christianson. We agree with Isaacson. We find that the "Proposal Contract," including the force majeure clause and the limitation of consequential damages clause, was an offer and that Christianson accepted that offer. The terms of the proposal, as subsequently modified by the parties, constitute the agreement of the parties. We hold that the trial court erred in not giving effect to the force majeure clause and the limitation of consequential damages clause, and we therefore reverse the judgment which was entered against Isaacson in favor of Christianson.[21]

■ In considering the question of Isaacson's liability for damages resulting from late delivery, it is first necessary to determine the terms of the Isaacson-Christianson contract. Isaacson contends that the proposal of July 16, 1973, was an offer which was accepted by Christianson in the August 2, 1973, telephone conversation, during which Christianson informed Isaacson that the steel fabrication job was theirs. The trial court concluded that the "proposal was never in form accepted, but serve[d] as a basis for further negotiations." [22]

AS 45.05 does not include a definition of an offer. Therefore, pursuant to AS 45.05.-006, the common law must be consulted to

---

**20.** *See* note 18 *supra.*

**21.** On appeal Isaacson also raises other issues. It contends that its performance under the contract was excused by the failure of pre-supposed conditions. Isaacson also contends that the delivery was not untimely since the parties modified the delivery terms so that Isaacson's delivery to Christianson was conditional on Armco's timely delivery to Isaacson. After due consideration we find these arguments to be without merit.

**22.** Since there is no dispute as to the actual terms of the proposal, only as to the legal effect of the proposal, this issue involves a question of law. The "clearly erroneous" standard which is used in reviewing a trial court's factual findings is therefore not applicable in this instance. *See A & G Constr. Co. v. Reid Bros. Logging Co.,* 547 P.2d 1207, 1212 (Alaska 1976).

resolve the question.[23] *See* 1 W. Hawkland, A Transactional Guide to the Uniform Commercial Code § 1.08, at 12 (1964); 1 A. Squillante & J. Fonseca, Williston on Sales § 7–3, at 213 (4th ed. 1973). We relied on Professor Corbin's definition of an offer in our decision in *Spenard Plumbing & Heating Co. v. Wright*, 370 P.2d 519, 524–25 (Alaska 1962). Professor Corbin has defined an offer as "an expression by one party of his assent to certain definite terms, provided that the other party involved in the bargaining transaction will likewise express his assent to the identically same terms," and he emphasizes that "an offer creates a power of acceptance in the offeree." 1 A. Corbin, Contracts § 11, at 23–24 (1963).

Isaacson's proposal appears to satisfy this definition of an offer. Isaacson's assent to the terms in the proposal is indicated by the signature of R. K. Uht, Vice-President of Isaacson. Furthermore, the language of the proposal clearly indicates that it contemplates the possibility of acceptance by Christianson. For example, the last paragraph of the first page of the proposal provides in part: "This proposal, when signed by the purchaser or duly authorized representative, is an acceptance of the above terms and conditions."[24] The proposal also included a space for the purchaser's signature under the words "Proposal Accepted."

The question is whether there was a "definite and seasonable expression of acceptance or a written confirmation" sent by Christianson accepting Isaacson's offer within the meaning of AS 45.05.062(a).[25] Isaacson argues that the August 2, 1973, telephone conversation was the acceptance of the proposal with changes as to the three terms discussed: (1) price, (2) F.O.B. point, and (3) pier nose height. Christianson's letter of confirmation of August 2, 1973, mentioned those three terms and the fact that delivery was required by late January, 1974. It also confirmed in writing the fact that Isaacson had received the award of the contract for the steel. The court concluded that in the August 2 telephone call Christianson entered into an oral contract *based upon* the proposal but did not *accept* the proposal.

Our view that the proposal was an offer that was accepted finds support in *Jorgensen Co. v. Mark Construction, Inc.*, 56 Haw. 466, 540 P.2d 978 (1975), a case involving facts very similar to those of the instant case. In *Jorgensen*, Mark was bidding on a state highway construction project. Prior to submitting its bid it obtained a quotation from Jorgensen for steel pipe that would be required in the project. Mark was awarded the contract. At Jorgensen's request, Mark issued a purchase order to Jorgensen for the pipe. The purchase order, however, did not mention limitation of warranty, while Jorgensen's quotation had contained a limitation of liability clause. Noting that the quotation contained all the terms necessary to constitute a contract, the Hawaii Supreme Court found that the quotation was an offer that was accepted by Mark's issuance of its purchase order. The court pointed out that U.C.C. § 2–207(2)[26] did not

23. AS 45.05.006 provides:
*Supplementary general principles of law applicable.* Unless displaced by the particular provisions of this chapter, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause, supplement its provisions.
This section is essentially identical to U.C.C. § 1–103.

24. We reject Christianson's contention that this sentence expressly limited the method of acceptance to the purchaser's signing the form.

AS 45.05.060(a)(1), the counterpart of U.C.C. § 2–206(1)(a), provides: "Unless otherwise unambiguously indicated by the language or circumstances . . . an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances . . . ." There is nothing in the language of the proposal that excludes acceptance by some method other than signing the form.

25. *See* note 6 *supra*.

26. *Id.*

come into play, since there were no additional terms or conflicting or different terms in Mark's purchase order. The court went on to state, "Issuance of the purchase order objectively manifested Mark's acceptance of and assent to all terms proposed by Jorgensen. Mark's silence was not an effective rejection or a counteroffer. The limitation of warranty and liability provision was a part of the contract between the parties." 540 P.2d at 983.

In this case, as in *Jorgensen*, the proposal contained all the terms necessary to constitute a contract. It was not a casual communication. The fact that the written proposal was submitted at Christianson's request following a quotation by telephone suggests it was an offer rather than merely a conveyance of price information, since the price information had already been communicated by telephone. In the letter of August 2, 1973, and in the telephone call which preceded the letter, Christianson was silent as to liability terms. At that point, as in *Jorgensen*, the only document that had discussed limitation of liability was the offeror's proposal. Although Christianson stated that a purchase order would follow, a purchase order was never sent, and no objection was ever made to the limitation of liability portions of the proposal.

Our view also finds support in *Construction Aggregates Corp. v. Hewitt-Robins, Inc.*, 404 F.2d 505 (7th Cir. 1968), *cert. denied*, 395 U.S. 921, 89 S.Ct. 1774, 23 L.Ed.2d 238 (1969). In that case the court found that, where the seller made a counteroffer in response to an offer to buy and the buyer subsequently objected to only one term of the counteroffer, the buyer had acquiesced in the remaining terms of the counteroffer. 404 F.2d at 510. Similarly, Christianson, in the August 2 telephone conversation, negotiated modifications of certain terms in the proposal but did not voice objections to the remaining terms. In so doing Christianson acquiesced in the remaining terms and those terms became part of the contract.

The fact that the parties never discussed some of the terms does not preclude their becoming part of the contract.[27] The effect of AS 45.05.062(a) and (b) [28] is to form a contract based on the terms of the offeror, unless the offeree in response has proposed additional or different terms. *See* Barron & Dunfee, *Two Decades of 2–207: Review, Reflection and Revision*, 24 Clev.St.L.Rev. 171, 178 (1975). If Christianson had objections to any of the terms of the offer, it could have prevented those terms from becoming part of the contract by expressly making its acceptance of the offer conditional on Isaacson's assent to different terms, as provided for in AS 45.05.062(a).[29] Christianson also could have prevented the objectionable terms of the offer from becoming part of the contract by presenting Isaacson with a form, such as a purchase order, that included conflicting terms. AS 45.05.062(b).[30] Since Christianson did not manifest any objection to the terms printed on the back of Isaacson's proposal, those terms became part of the contract.[31]

**27.** The trial court seemed to base its conclusion that Isaacson's force majeure clause and limitation of consequential damages clause were not part of the contract on the absence of any discussion of these issues. The court stated: The written proposal was stated to be, quote, subject to conditions on reverse side hereof. Among these conditions was a statement that [Isaacson] would not recognize claims for consequential damages and a provision exempting Isaacson from liability for delay due to certain specified conditions beyond its control. Such a provision is commonly called a force majeure clause. These conditions were never pointed out to Christianson or Reynolds or specifically mentioned in the oral discussion.

**28.** *See* note 6 *supra*.

**29.** *Id.*

**30.** *Id.* The inclusion of conflicting terms in the offeree's response is considered to be an objection to the terms contained in the offer. *Lea Tai Textile Co. v. Manning Fabrics, Inc.*, 411 F.Supp. 1404, 1407 (S.D.N.Y.1975). *See* U.C.C. § 2–207, Official Comment 6.

**31.** If Christianson had actually sent its purchase order to Isaacson, the order form might have presented Isaacson with terms that conflicted with the exculpatory terms of Isaacson's form. Christianson's purchase order stated that the "Purchase Order Contract is subject to terms and provisions printed on the reverse hereof . . . ." The "reverse hereof," however, is not included in the record on appeal.

■ We therefore find that the Isaacson-Christianson contract included Isaacson's limitation of consequential damages clause. This finding, however, does not affect the damages actually awarded to Christianson by the trial court, since the trial court concluded that all of Christianson's damages were general rather than consequential. Although Isaacson on appeal argues that the trial court erred in classifying certain damages as general damages, we find that the issue is not properly before this court. Isaacson did not raise this point in either its original statement of points on appeal or its supplemental statement. Pursuant to Rule 9(e), Alaska R.App.P., we will not consider points not included in appellant's statement of points on appeal. *Wetzler v. Wetzler*, 570 P.2d 741, 742 n. 2 (Alaska 1977); *Moran v. Holman*, 501 P.2d 769, 770 n. 1 (Alaska 1972).

Although our finding that the contract excluded recovery of consequential damages does not invalidate the award of damages to Christianson, this finding is dispositive of Christianson's contentions on appeal. On appeal Christianson challenges the trial court's disallowance of certain items of damages, but Christianson admits that the damages sought on appeal are consequential damages. Under the terms of the contract, as we have construed it, such damages are not recoverable.

While we agree that there was evidence to support the trial court's finding that the contract called for delivery by a specific date, we conclude for the reasons discussed above that Isaacson's force majeure clause [32] became a part of the contract. This finding does affect the damages awarded to Christianson. First, this clause specifically lists strikes as excuses for performance. Therefore, to the extent that Isaacson's delivery was delayed due to the strike at its plant, the failure to perform is excused. Second, the clause does not list late delivery from a supplier as one of the events whose occurrence would exempt Isaacson from liability for failure to perform. The late delivery from Armco, however, could still excuse Isaacson's failure to perform, if late delivery by Armco constitutes a cause "beyond the reasonable control of the seller," so as to come within the catch-all provision of the force majeure clause.[33]

We therefore find it necessary to remand the case for a determination of whether Armco's late delivery to Isaacson was beyond Isaacson's reasonable control. If, on remand, it is determined that the late delivery from Armco does come within the force majeure clause, then, to the extent that Armco's delay was responsible for Isaacson's failure to ship to Christianson on time, Isaacson's failure is excused. Isaacson would then be liable to Christianson only to the extent that the late delivery was not caused either by the strike or by Armco's late delivery. If, on the other hand, the later delivery from Armco is determined not to come within the force majeure clause, Isaacson's failure to deliver on time is excused only to the extent that it was caused by the strike.

On the record before us, we are unable to determine exactly what conclusion the trial court reached regarding the cause of Isaacson's delay.[34] On remand the court should

---

The effect of a conflict in terms would have been to negate the conflicting terms of each form, and resort would have been made to the statute to fill in the missing terms. AS 45.05.-062(c). By failing to send its purchase order to Isaacson, Christianson avoided any real "battle of the forms," the situation that this section of the statute (U.C.C. § 2–207) is frequently called upon to resolve. Because the case at bar does not involve conflicting terms, Christianson's reliance on *Air Prods. & Chems., Inc. v. Fairbanks Morse, Inc.*, 58 Wis.2d 193, 206 N.W.2d 414 (1973), is misplaced.

**32.** *See* note 18 *supra*.

**33.** *Id.*

**34.** The trial court did not render written findings of fact. A tentative decision was read into the transcript prior to the closing arguments, and the final decision was read into the transcript after closing arguments. It is, therefore, difficult to understand precisely what the court's conclusions were as to the questions of causation. At one point the court indicates that Armco's late delivery led to Isaacson's delay in delivery to Christianson. *Transcript*

prepare detailed findings of fact, based on the existing record, regarding the cause or causes of Isaacson's delay, so that damages may be imposed in accordance with this decision.

On remand it will also be necessary for the court to make a new determination on the issue of attorney's fees. The court ordered that Armco pay the attorney's fees of both Christianson and Isaacson, but since we find that Armco is excused from liability, that order is necessarily reversed. Armco now presumably will be entitled to some reimbursement for its attorney's fees pursuant to Rule 82, Alaska R.Civ.P. Any award of fees between Isaacson and Christianson, of course, will depend on the determination of liability.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings in accordance with this decision.

BOOCHEVER, Chief Justice, concurring.

Although I agree with the conclusion that the notice of breach was not given within a reasonable time, I do not agree with the categorical assertion that equitable principles may not modify the strict notice requirements of AS 45.05.174(c)(1). In my opinion, the mere presence of a specific relevant provision in the code does not automatically displace general equitable principles. I believe that this construction is consistent with the purpose of UCC § 1–103 which states that equitable principles apply "[u]nless displaced by the particular provisions of [the code]." *See* Summers, General Equitable Principles under Section 1–103 of the Uniform Code, 72 Northwestern U.L. Rev. 906, 936–42 (1978).

MATTHEWS, Justice, dissenting, with whom RABINOWITZ, Justice, joins.

I think the majority's conclusion that notice of a breach cannot be given by service of a complaint is unduly harsh. Here, for example, if Isaacson had filed suit against Armco a few days after delivery, I cannot believe that it would be correct to leave Isaacson without a remedy. Filing suit without prior notice may be impolite but it is not deceptive or dishonest and it certainly is no hindrance to "normal settlement through negotiation." Often, in fact, serious settlement negotiations do not take place until a lawsuit is filed.

There are authorities which take the view that notice can be supplied by filing a complaint.[1] I think they reflect a more just and realistic view than cases to the contrary, and I would follow them. It would then be necessary to remand this case to the superior court for a determination of the timeliness of the notice given Armco by way of Isaacson's third party complaint. Such a determination is ordinarily a question of fact to be made in light of the surrounding circumstances.[2] Here, the lack of prejudice to Armco [3] and the contingent nature of Isaacson's claim against Armco would play an important role. This question should be left to the trier of fact.

2558–59. The court also indicates that the strike was irrelevant. *Id.* These findings by the court are contradicted by the court's statement that even timely delivery by Armco would not have permitted Isaacson to ship in time to permit the winter erection. *Id.* at 2736. On the one hand, the court suggests that Armco's late delivery was the sole cause of Isaacson's failure to perform, while on the other hand, it indicates that even timely delivery by Armco would not have permitted timely performance by Isaacson. Because of this ambiguity, it is unclear to us precisely what caused Isaacson's delay.

1. *E. g. Pace v. Sagebrush Sales Co.*, 114 Ariz. 271, 560 P.2d 789, 792 (1977); *Davidson v. Wee*, 93 Ariz. 191, 379 P.2d 744, 749 (1963); *Dowdle v. Young*, 1 Ariz.App. 255, 401 P.2d 740, 742 (1965); *Henderson Tire & Rubber Co. v. P. K. Wilson & Son, Inc.*, 235 N.Y. 489, 139 N.E. 583, 585 (1923); *Silverstein v. R. H. Macy & Co.*, 266 A.D. 5, 40 N.Y.S.2d 916, 920 (1943).

2. *E. g. Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 973 (5th Cir. 1976); *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 298 (3rd Cir. 1961); 2 R. Anderson, Uniform Commercial Code § 2–607:24 (1971); 67 Am.Jur.2d Sales §§ 21,294, at 131, 434 (1973).

3. *See, Deveny v. Rheem Mfg. Co.*, 319 F.2d 124, 130 (2nd Cir. 1963); *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 298 (3rd Cir. 1961); *Pettulla v. Corp Bros., Inc.*, 107 R.I. 599, 268 A.2d 699, 703 (1970).

I also disagree with the court's resolution of the question whether the contract between Christianson and Isaacson contained a force majeure clause. The trial judge found that there was an express agreement in their contract for a firm delivery date, which was in conflict with and therefore took precedence over the force majeure clause contained in the offer of July 16. This determination is one of fact [4] and one which the trial judge made with an awareness that conflicting evidence existed. He stated:

> I could see that questions of contract formation could have been resolved other than I have. Nevertheless, it seems to me that the evidence weighs more heavily in favor of finding that as to both the Christianson-Isaacson contract and the Isaacson-Armco contract time was of the essence, a firm delivery date was promised, and that firm delivery date was part of the bargain and part of the consideration for the contracts.

The trial judge's finding on this point is not, in my view, clearly erroneous [5] and therefore should be upheld.

---

4. See, e. g., Alaska Placer Co. v. Lee, 553 P.2d 54, 59 (Alaska 1976).

5. See note 4 supra.

Testimony of Christianson and Reynolds of Christianson Construction Company and two contemporaneous memoranda support the finding of a firm delivery date.