688 F.2d 1003
 34 UCC Rep.Serv. 1165
 GOODPASTURE, INC., Plaintiff-Appellee Cross-Appellant,
v.
M/V POLLUX, ETC., Defendant-Appellant Cross-Appellee,
and
NEGOCIOS DEL MAR, S.A., etc., Defendant-Third Party
Plaintiff-Appellant Cross-Appellee,
v.
EMPAC GRAIN CO., etc., Defendant-Appellee,
and
A Shipment of Wheat of 19,067.949 Metric Tons, etc.,
Third-Party Defendant- Appellee.
 No. 80-2216.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 12, 1982.
 
 Royston, Rayzor, Vickery & Williams, Kenneth D. Kuykendall, Houston, Tex., for defendant-appellant cross-appellee.
 Michael D. Sydow, Houston, Tex., for Goodpasture.
 Osvaldo Grzesik, President, Empac Grain Corporation, Inc., pro se, for Empac Grain.
 Appeals from the United States District Court for the Southern District of Texas.
 Before COLEMAN, POLITZ and GARWOOD, Circuit Judges.
 POLITZ, Circuit Judge:
 
 
 1
 We again address the claims arising out of an aborted sale of approximately 20,000 metric tons of number two hard red winter wheat. The factual setting of this involved dispute is essentially detailed in our prior opinion, Goodpasture, Inc. v. M/V POLLUX, 602 F.2d 84 (5th Cir. 1979). On remand, additional facts were developed. Subject to one minor modification, we perceive no clearly erroneous factual finding and find no error of law in the trial court's disposition. Accordingly, we modify and affirm.
 
 
 2
 Goodpasture, Inc., a Texas corporation engaged in wheat transactions, contracted with Empac Grain Corporation, Inc., a New York corporation, for the sale of the noted quantity of wheat. Empac was to acquire the wheat for Idema, a Colombian governmental entity. The agreement ultimately negotiated provided for payment to Goodpasture under an assignment of proceeds of an irrevocable letter of credit established for Empac by Idema. Goodpasture was designated as Empac's agent to gather the documents necessary for payment under the letter of credit.[1]
 
 
 3
 Empac entered into a time charter party with Negocios del Mar, S.A., a Peruvian shipping concern, for the M/V POLLUX, which was to transport the grain from Houston, Texas to Buenaventura, Colombia. After certain delays and difficulties which are not of immediate relevancy, the vessel arrived and Goodpasture loaded the grain. The ship's master, acting under revised instructions from the owner, insisted on payment consistent with the charter party and refused to sign freight prepaid bills of lading. Without that documentation, Goodpasture could not effect payment under the letter of credit. Goodpasture had loaded its wheat aboard the POLLUX, the vessel was prepared to depart, but Goodpasture, obligated to pay its vendor for the wheat, could not secure payment. Goodpasture filed an in rem suit resulting in the arrest of the vessel, later amended to seek personal judgment against Empac and Negocios.
 
 
 4
 Shortly after the seizure, Goodpasture moved for discharge of the grain. Several weeks later, after due hearing and the posting of security as demanded by Negocios, the grain was removed from the POLLUX. The district court initially concluded that the refusal by Negocios to sign freight prepaid bills of lading did not constitute conversion of the wheat and that Goodpasture had no in rem rights against the vessel. The district court ordered the seizure released and Goodpasture's suit dismissed. On appeal, we reversed and remanded. 602 F.2d 84. The district court had found that title to the grain had not passed from Goodpasture to Empac. Consistent therewith, we held that the POLLUX had no claim against Goodpasture to support the maritime lien it had asserted against the cargo composed exclusively of Goodpasture's wheat. We further held that Negocios' seizure of Goodpasture's wheat as security for its claim against Empac was a maritime tort which gave rise to Goodpasture's in rem claim against the POLLUX.
 
 
 5
 On remand, the district court, because of Negocios' contention that further litigation as to the title to the wheat was not foreclosed by our decision, held evidentiary hearings at which Negocios was permitted to offer evidence relative to the title issue. Thereafter the district judge, in a scholarly, detailed and comprehensive opinion, found and concluded that, assuming the law of the case doctrine did not preclude further consideration of the title issue, the additional evidence supported and confirmed the conclusion that the POLLUX had exercised wrongful dominion over Goodpasture's wheat. Damages were awarded to Goodpasture, and counterclaims against Goodpasture and the cargo of wheat were rejected.
 
 Title to the Wheat
 
 6
 As a general rule, "a decision of a legal issue or issues by an appellate court establishes the 'law of the case' and must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court ...." White v. Murtha, 377 F.2d 428, 431-432 (5th Cir. 1967). An exception to this rule arises when " '(1) the evidence on a subsequent trial was substantially different, (2) controlling authority has since made a contrary decision of the law applicable to such issues, or (3) the decision was clearly erroneous and would work manifest injustice.' " Morrow v. Dillard, 580 F.2d 1284, 1290 (5th Cir. 1978) (quoting from White v. Murtha, 377 F.2d at 432).
 
 
 7
 Negocios' primary argument is that our prior opinion erroneously interpreted the provisions of the Texas Uniform Commercial Code[2] with respect to passage of title. An examination of the Texas U.C.C. quickly reflects that parties may control passage of title as between themselves by contractual agreement.[3] Tex. Bus. & Com. Code Ann. tit. 1, § 2.401(a) (Vernon); J. White & R. Summers, Uniform Commercial Code at 139 (1980). See Heinrich v. Wharton County Livestock, Inc., 557 S.W.2d 830 (Tex. Civ. App. 1977). Moreover, as the district court noted, a "usage of trade," defined as "any practice or method of dealing having such regularity of observance in a place ... or trade as to justify an expectation that it will be observed with respect to the transaction in question," Tex. Bus. & Com. Code Ann. § 1.205(b) (Vernon), should be read as giving "particular meaning to and supplement(ing) or qualify(ing) terms of an agreement." Section 1.205(c).[4] We affirmed the district court's finding that the custom and usage in the grain trade called for title to pass upon payment and that Empac and Goodpasture had agreed to this arrangement. Our earlier opinion does not fall within the clearly erroneous exception. Concluding that the other exceptions are inapplicable, we are constrained to conform to the law of the case rubric and decline further review of this claim.[5]
 
 Measure of Damages
 
 8
 The district court awarded Goodpasture damages in the amount of $224,198.40, representing the difference in the amount Goodpasture was to receive for its services under the Empac contract and the amount ultimately received pursuant to a subsequent sale to Dreyfus Corporation. In reaching this conclusion, the court referred to the basic principles that damages in a conversion action should compensate for the loss actually sustained as a result of the tortfeasor's wrong, Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890 (1924), and a plaintiff may generally recover the reasonable market value of the goods converted, as of the time and place of conversion, Harrington v. Texaco, Inc., 339 F.2d 814 (5th Cir.), cert. denied, 381 U.S. 915, 85 S.Ct. 1538, 14 L.Ed.2d 435 (1964); Restatement (Second) of Torts § 222A (1965). In determining market value, the court must focus on the market to which the damaged party would resort in order to replace the subject goods. Restatement (Second) of Torts § 911, Comment 6 (1965).
 
 
 9
 The district court applied these principles to Goodpasture's claims. It found Goodpasture engaged in the grain handling business, routinely receiving payment from its customers for elevating, grading and performing other services involved in the delivery of grain to a common carrier. Typically, Goodpasture would be compensated for its services through the payment of a premium over and above the market price of wheat. The record reflects, and the district judge so found, that this premium market fluctuated in the same manner as the commodities market itself.
 
 
 10
 The district court credited the testimony of Robert Steele, executive vice-president and general manager of Goodpasture, explaining his company's method of operation. Steele testified that in a typical transaction a customer would acquire grain futures for Goodpasture's account, enabling Goodpasture to purchase the grain. When delivered, Goodpasture would elevate, grade and load the grain upon a designated carrier and would be paid a sum equal to the "flat" price of the grain and the premium agreed upon for Goodpasture's services.
 
 
 11
 In the case at bar, Goodpasture contracted to sell Empac 700,620 bushels of wheat, priced at "74 cents over Kansas City May." This contract obligated Empac to pay Goodpasture, after the wheat was elevated, graded and loaded, the amount of the May quotation for delivery in Kansas City plus 74 cents per bushel for Goodpasture's services.[6] The sale was never consummated and payment was never made.
 
 
 12
 After the collapse of the Goodpasture/Empac transaction and the discharge of the grain from the POLLUX, Goodpasture sold the wheat to another purchaser under a contract which provided for a premium of 42 cents per bushel. There is no dispute in the record that the prevailing premium for handling grain at the time of the resale was 42 cents per bushel. Finding that the flat price of the wheat was not the relevant factor in computing loss, that factor typically being a wash-out, the district court awarded Goodpasture damages composed of the difference between the amount of the premium payment it would have received under the Empac contract and the amount actually received in the subsequent sale.[7]
 
 
 13
 Negocios contends that the district court erred in finding that Goodpasture actually suffered a loss as a result of the conversion because the wheat was subsequently sold at a higher flat rate than the amount which was to be paid by Empac. Specifically, Goodpasture had contracted to sell the wheat to Empac for $3.921/2 per bushel and actually sold it for $4.40 per bushel. Negocios argues that Goodpasture actually profited from the conversion and only incurred losses, if any, on the futures market because it traded futures to hedge its position during the controversy. The surface appeal of this contention fades upon closer examination of the record.
 
 
 14
 All of the testimony offered throughout this extended litigation supports the district court's finding of fact as to the relevant market for determining Goodpasture's loss.[8] The amount of damages is a factual issue, vulnerable on appellate review only if shown to be clearly erroneous. Todd Shipyards Corp. v. Turbine Service, Inc., 674 F.2d 401 (5th Cir. 1982). The trial judge is accorded great latitude in awarding damages. Drake v. E. I. Dupont de Nemours & Co., Inc., 432 F.2d 276 (5th Cir. 1970). See Socony Mobil Oil Co., Inc. v. Texas Coastal & Intern., Inc., 559 F.2d 1008 (5th Cir. 1977).
 
 
 15
 We cannot label as clearly erroneous the district court's finding that Goodpasture was in the business of handling grain and received a premium for each bushel sold in recompense for its services; or the finding that under the Empac contract it would have received a premium of 74 cents per bushel; or that Negocios' conversion interrupted the sale to Empac; or that in the resulting substitute sale Goodpasture received a premium of 42 cents per bushel. Because of the uncertainty of getting the grain off the POLLUX, and the pressing need to pay for that grain, Goodpasture had to hedge its position by selling futures at a lower premium price. The district court's finding that the difference between the lower 42 cents over price and the original 74 cents over price is the proper measure of damages is likewise not clearly erroneous.[9]
 
 Consequential Damages
 
 16
 Negocios challenges several specific elements of damages awarded Goodpasture. Error is alleged in the district court's award of consequential damages for interest in the amount of.$56,223.90, carrying charges in the amount of $11,236.59, dispatch charges of $4,292.71, and shifting expenses of $20,562.08.
 
 
 17
 Interest. When the Empac sale cratered and Goodpasture could not remove the grain from the POLLUX, it became necessary for Goodpasture, who still owed for the grain, to borrow funds to pay for it. Interest totaling $56,223.93 accrued on this loan. The district court found this cost to be a recoverable item of damages. Negocios argues that because Goodpasture ultimately sold the wheat at a profit, the costs of financing the payment for the grain while it was on board the POLLUX should not be recovered. We are not persuaded. The interest charges are recoverable as an expense incurred in mitigation of damages.
 
 
 18
 Carrying charges. The trial judge awarded Goodpasture $11,236.59 for carrying charges. This sum represents the amount Goodpasture would have collected had the contract been consummated and, as such, is a recoverable item. However, Steele testified that these charges totaled $4,904.34.[10] This item of damages must be adjusted accordingly.
 
 
 19
 Dispatch. The district court awarded $4,292.71 for dispatch, the amount Goodpasture would have collected from Empac for completing the loading within the allotted time. The conversion prevented collection of this sum.
 
 
 20
 Shifting expenses. Negocios challenges the award of $20,562.08 for expenses incurred in moving the POLLUX into and out of the discharging berth during the period in question. This expense was found to be a recoverable item of damages. We perceive no reversible error in this finding.
 
 
 21
 Finally, as to Goodpasture, we affirm the allowance of pre-judgment interest. Socony Mobil Oil Co., Inc. v. Texas Coastal & Intern., Inc., 559 F.2d 1008 (5th Cir. 1977).
 
 Negocios v. Empac
 
 22
 Negocios assigns error in the district court's calculation of its damages for breach of the charter party. We find no merit in the contentions urged. The district court's award of damages against Empac is affirmed.
 
 
 23
 The judgment of the district court as to the element of carrying charges is adjusted from $11,236.59 to $4,904.34, and as MODIFIED, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 The letter of credit required: (i) commercial invoice, (ii) bill of lading, (iii) certificate of weight, (iv) phytosanitary certificate, (v) certificate of analysis, (vi) certificate of inspection, and (vii) certificate of origin
 
 
 [2]
 The parties agreed that the terms of the Texas Uniform Commercial Code applied to this sale of grain
 
 
 [3]
 Negocios argues that under Matter of Samuels & Co., Inc., 526 F.2d 1238 (5th Cir. 1976) (en banc), we must find that title to the grain passed to Empac at the time of delivery. The issue in Samuels involved the question of title as between the seller and a holder of a perfected security interest. Here, only the buyer and the seller, with an explicit agreement concerning passage of title, are involved in the critical dispute
 
 
 [4]
 For further discussion of the importance of trade usage in illuminating the terms of an agreement, see Comment Four, Tex. Bus. & Com. Code Ann. tit. 1, § 1.205 (Vernon)
 
 
 [5]
 Negocios offered evidence on remand which attempted to show that Goodpasture was acting only as a representative of Empac in retaining the documents of title, that Goodpasture is estopped from claiming it is the owner of the grain, that Empac and Goodpasture were joint owners of the cargo, and that Goodpasture and Empac breached a contract with Negocios. As we stated in National Airlines, Inc. v. International Ass'n of M. & A. W., 430 F.2d 957, 960 (5th Cir. 1970), "(t)he exception to law of the case where 'evidence on a subsequent trial (is) substantially different' is inapplicable where by the prior appeal the issue is not left open for decision." The issue of title to the grain was not left open by our prior opinion. The issue is foreclosed
 
 
 [6]
 Grain futures are priced, quoted and may be purchased for five different months-March, May, July, September and December. Quotations also relate to points of delivery
 
 
 [7]
 Goodpasture's contract with Empac provided a premium of 74 cents; the later sale produced a premium of 42 cents. The difference, 32 cents, times 700,620 bushels, reflects damages for this item totaling $224,198.40
 
 
 [8]
 The parties agreed that testimony adduced at the hearing on the discharge security could be used on trial of liability. This included two witnesses called by Goodpasture, Robert Steele and Frank Hammond, general manager of Cargill, Inc., a competitive grain handling firm. Steele testified that the relevant market was the futures market and the premium reflected. Hammond testified that Goodpasture's actions under the circumstances were prudent and he confirmed Steele's market loss calculations
 No testimony was offered on remand to support the flat price theory now pressed on appeal. Negocios called Steele as an adverse witness and offered the testimony of R. P. Daly, a grain trading expert. Daly offered no guidance as to how to measure damages, but he found prudent the action of Goodpasture using futures as a hedge when the Empac sale collapsed. Goodpasture called an executive with Dreyfus Corporation, the ultimate purchaser of the grain, who corroborated Steele's testimony, and also called a supportive grain broker and grain trader. Empac called George Vatistas, a shipping consultant who had been Empac's agent during the transaction. Neither Vatistas nor the two witnesses offered by Negocios addressed damages.
 
 
 [9]
 Negocios also contends that the district court erred in calculating damages because Steele had testified at the August 1979 hearing that Goodpasture's loss on the futures market was 29.4 cents per bushel, not 32 cents per bushel. A review of that testimony reveals some ambiguity. However, the record is replete with evidence that the original contract price was 74 cents over, and the grain was ultimately sold for 42 cents over
 
 
 [10]
 Steele testified about all items of damage sustained by Goodpasture, including the carrying charges
 Q. The last item?
 A. Sixteen is carrying charges, $4,904.34. Under the contract terms the vessel came into our berth and filed late, and for us to hold the grain at our elevator while the vessel is late, the contract calls for carrying charges. Had the contract gone through, we would have collected carrying charges.