### In re ATLANTIC ORIENT CORPORATION,
### Debtor.

**Atlantic Orient Corporation, Plaintiff,**

**v.**

**AOC Energy LLC, and Darrell Hotchkiss, Esq.,**
**Defendants.**

**Bankruptcy No. 02–12844–JMD.**
**Adversary No. 02–1132–JMD.**

United States Bankruptcy Court,
D. New Hampshire.

Feb. 20, 2003.

---

Connie Rakowsky, Pamela E. Phelan, ORR & RENO, Concord, New Hampshire, for Debtor/Plaintiff.

Terrie Harmon, Watson, Bosen, Harman, Venci & Lemire P.A., Portsmouth, New Hampshire, for Defendants.

## *MEMORANDUM OPINION*

J. MICHAEL DEASY, Bankruptcy Judge.

## I. INTRODUCTION

On September 16, 2002, Atlantic Orient Corporation (the "Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On September 20, 2002, the Debtor commenced this adversary proceeding against the Defendants seeking injunctive relief. On September 27, 2002 the Court held an evidentiary hearing on the Debtor's request for a Preliminary Injunction. At the conclusion of the evidentiary hearing the Court stated its findings and rulings on the record, granted a preliminary injunction and directed the debtor to file a proposed order by noon on September 30, 2002 (Doc. No. 14). On October 1, 2002 the Court entered an order

granting the Debtor's request for a preliminary injunction (Doc. No. 15).

The Debtor filed a motion to convert the preliminary injunction into a permanent injunction on November 15, 2002 (Doc. No. 28) (the "Injunction Motion"). Defendant AOC Energy LLC responded with a motion for summary judgment against the Debtor (Doc. No. 30) (the "SJ Motion"). At the commencement of the hearing on the Injunction Motion and the SJ Motion on December 23, 2002, the parties agreed on the record that they were both asking the Court to render a final decision on the permanent injunction issue based upon the evidentiary record established at the September 27, 2002. Therefore, even though the pleadings were filed as cross motions for summary judgment, the parties have agreed to submit the matter to the Court on a stipulated record. Accordingly, "[t]his Court must review the record, draw such inferences as are reasonable, decide any significant issues of material fact, and, applying the governing law, enter such judgment as may be appropriate." *Watson v. Deaconess Waltham Hosp.*, 141 F.Supp.2d 145, 147 (D.Mass.2001) (citing *Boston Five Cents Sav. Bank v. Dep't. of Hous. & Urban Dev.*, 768 F.2d 5, 11–12 (1st Cir.1985)).

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.   FACTS

Prior to September 9, 2002 James Heath ("Heath") purportedly held a valid perfected security interest in all, or substantially all, of the Debtor's assets. Pursuant to one or more defaults in the Debtor's obligations to him, Heath noticed a secured party's sale of those assets. The sale was noticed for and held at the offices of the Debtor at Sherwin Farm, Farrell Farms Road, Route 5 North, Norwich, Vermont at 10:00 a.m. on Monday, September 9, 2002. *See* Exhibit 101. Under the terms of the notice of sale, all of the collateral was to be sold as a single lot at a public auction to the highest bidder. *Id.* The notice stated that the "high bidder will pay a deposit of 35% of the price by certified or bank check and the balance within 10 days of sale." *Id.*

At the public auction defendant Darrell Hotchkiss ("Hotchkiss"), as agent for defendant AOC Energy LLC ("AOC"), was the high bidder at a price of $395,000.00.[1] He tendered as a deposit a bank check payable to Heath in the amount of $157,500.00.[2] On September 11, 2002, Hotchkiss sent a letter to Attorney K. William Clauson, counsel for the secured creditor ("Clauson"), confirming that he planned to deliver the balance of the purchase price, $237,500.00, the next day. The letter also asked Clauson to provide Hotchkiss with a copy of the proposed bill of sale "as soon as possible" as well as the title to a pickup truck. The letter also listed as "additional closing requirements" a request for information on equipment, contracts, and customer orders, including a

---

**1.** It is undisputed that Hotchkiss was at all times acting as agent for AOC. No issue has been raised regarding the scope of his authority. Accordingly, Hotchkiss and AOC are one and the same bidder and purchaser.

**2.** Transcript of Continued Hearing Regarding Request for Temporary Restraining Order, Evidentiary Hearing on the Debtor's Request for Preliminary Injunction held on September 27, 2002 (hereinafter "Tr") at page 9, lines 8–11.

list of all persons who have copies of the drawings, blueprints and bill of materials for a model 15/50 wind turbine and its component parts (the "Wind Turbine Property"). The letter acknowledged that Clauson might not be able to physically deliver all of the materials requested by the next day, but did state that "with respect to such items identified [as Wind Turbine Property], *I need to take physical possession.*" (Emphasis added) Exhibit 102.

Although Hotchkiss was unsuccessful in communicating with Clauson by telephone or in writing, on Friday, September 13, 2002 he hand delivered a letter to Clauson's law office in which he indicated that the letter and certain enclosures "completes the transfer of all of the assets of [the Debtor], *except for those matters discussed below* to which you have not responded, or may be unable to respond." (Emphasis added) Exhibit 3. The "matters discussed below" included:

*Bill of Sale.* Since I have had no success in securing a proposed Bill of Sale from James Heath to me, I have taken the liberty of preparing one myself. If you are not available this afternoon to execute the Bill of Sale on behalf of your client, the enclosed checks are to remain with your office, and I would expect that you would execute the Bill of Sale first thing Monday morning, September 16.

*Other Requested Documentation.* There are a number of documents which only you or James Heath might be able to provide requested in my letter of September 11, 2002 to which there has been no response. I would expect that those requested materials will be furnished by you or your client before the

close of business on Friday, September 20, 2002.

Exhibit 3.

Enclosed with the letter were the following bank checks:

| Payee | Amount |
| --- | --- |
| James Heath | $ 92,500.00 |
| Clauson & Atwood Client Trust Account | $ 15,000.00 |
| Atlantic Orient Corporation | $130,000.00 |
| | $237,500.00 |

*See* Exhibits 103 and 104. Hotchkiss also sent a letter on September 13, 2002 to Robert Sherwin, the lessor of the Debtor's offices, stating that he had completed the purchase of all of the Debtor's assets that afternoon and enclosed a check in the amount of $750.00 for payment of rent on the Debtor's former offices "for the next two weeks." Exhibit 105.

On Monday, September 16, 2002, Clauson sent a letter to Hotchkiss acknowledging delivery of the three checks on September 13, 2002. However, he advised Hotchkiss that the check payable to the Debtor in the amount of $130,000.00 was unacceptable due to the existence of a junior secured creditor and the fact that the Debtor was not entitled to auction proceeds in that amount.[3] By the end of the day on September 19, 2002, the tenth day after the auction, Hotchkiss had not replaced the check which Clauson had advised him was unacceptable.

On Friday, September 20, 2002, Clauson delivered to Hotchkiss' office two checks totaling $265,000.00 and returned the bank check payable to the Debtor in the amount of $130,000.00. Exhibit 8. At the end of the day Hotchkiss returned to his office to find a letter from Clauson enclosing the checks. He immediately faxed a letter to Clauson indicating that he did not accept the checks and would hold the checks in

---

**3.** The Debtor filed its petition under Chapter 11 of the Bankruptcy Code on September 16, 2002.

trust until Monday morning when he would return them to Clauson. In his letter, Hotchkiss characterized Clauson's actions as "a futile attempt to undo a transaction which was *consummated on the afternoon of September 13th.*" (emphasis added) Exhibit 111.

At the hearing on the preliminary injunction Clauson testified that: (a) although not specified in the sale notice, he expected to deliver a bill of sale to the high bidder upon payment of the balance of the purchase price;[4] (b) that the buyer wasn't entitled to ownership or possession of the property until the balance of the purchase price was paid;[5] and (c) that he thought Hotchkiss had the same understanding by virtue of his letter to Clauson dated September 11, 2002 (Exhibit 102).[6] Hotchkiss testified that: (a) the letter of September 11, 2002 was an explanation of the steps that he thought were necessary to close the purchase as soon as possible;[7] (b) that the matters and documents discussed in that letter were simply items he expected to see, but were not additional closing requirements or conditions;[8] and (c) that even if the additional documents were not provided, he "owned all of this stuff anyways."[9] Hotchkiss also testified that even though it was the customary understanding between him and Clauson that bills of sale were transferred with the transfer of assets, he "made it clear in my letter that

if the bill of sale wasn't executed the deal was done anyway."[10] However, on cross examination he was unable to point to any words in his letters of September 11, 13 or 20, 2002 (Exhibits 102, 3 and 111 respectively) which stated an understanding that a bill of sale was not a requirement and that he had title to the assets sold at auction as of September 9, 2002.[11]

At the conclusion of the evidentiary hearing on September 27, 2002 the Court granted the Debtor's request for a preliminary injunction. In its ruling the Court found that the standards set out in *New Comm Wireless Services, Inc. v. Sprint-Com*, 287 F.3d 1 (1st Cir.2002) and *Philip Morris v. Harshbarger*, 159 F.3d 670 (1st Cir.1998) had been satisfied. The Court found that the Debtor had a likelihood of success on the merits of its claim. After the close of the evidence both parties argued that they should prevail under the provisions of § 2–401 of the Uniform Commercial Code ("UCC").[12] The Court found that both parties contemplated that delivery of the goods purchased at the auction would be accomplished without moving the goods and that they both understood that title would transfer upon tender of the balance of the purchase price and delivery of a bill of sale.[13] Therefore the Court held that the Debtor had established a likelihood of success under § 2–401(3)(a) of the UCC.[14]

---

4. Tr at page 27, lines 12–25 and page 8, lines 12–20.

5. Tr at page 9, lines 18–23.

6. Tr at page 11, lines 11–22.

7. Tr at page 54, lines 15–21.

8. Tr at page 56, lines 10–16.

9. Tr at page 56, lines 19–20.

10. Tr at page 58, lines 16–20.

11. Tr at page 64, lines 7–11; at page 65, lines 24–25 and page 66, lines 1–8; at page 67, lines 9–12.

12. Hereinafter all references to the UCC shall refer to Vermont's enactment of the UCC.

13. Tr at page 141, lines 12–22.

14. § 2–401(3)(a) provides: "Unless otherwise explicitly agreed where delivery is to be made without moving the goods, if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents …"

## III. DISCUSSION

In the SJ Motion, AOC now argues that UCC § 2–328(2) determines the passing of title to it as a result of the auction sale and that UCC § 2–401 has no application. AOC contends that under UCC § 2–328(2) title passed to it upon the fall of the hammer on September 9, 2002 and, therefore, under UCC § 9–617 all of the Debtor's rights were transferred to AOC prior to the filing of the bankruptcy petition and that nothing remained to become property of the bankruptcy estate. Additionally, AOC argues that Article 9 of the UCC contains no provisions requiring tender of payment after a secured party's sale to be made in any particular form and that its tender of three separate checks, under the facts and circumstances of this case, was commercially reasonable.

The Debtor contends that UCC § 2–328 only addresses the manner of conducting a sale by auction and is not determinative of when title passes. The Debtor contends that the definition of "sale" in UCC 2–106(1) requires the Court to look to UCC § 2–401 to determine when title transfers. The Debtor also contends that Hotchkiss never properly tendered the balance of the purchase price because one of the checks was not payable to the seller, or an agent of the seller, and that no evidence was presented that the seller could have negotiated the check payable to the Debtor.

### A. Transfer of Title

UCC § 2–328(2) provides in pertinent part:

(2) *A sale by auction is complete* when the auctioneer so announces by the fall of the hammer or in other customary manner ...

(Emphasis added). UCC § 2–106(1) provides in pertinent part:

(1) ... A "sale" consists in the passing of title from the seller to the buyer for a price (Section 2–401) ...

AOC contends that if an auction sale is complete upon the fall of the hammer then, as a matter of law, title to the assets transferred to the buyer at that time. AOC appears to concede that this result may be varied by the agreement of the parties, but in this case the completion of the sale was never explicitly conditioned upon payment of the balance of the purchase price or the delivery of a bill of sale. AOC cites *Dinkel Enter., Inc. v. Colvin (In re Bailey Pontiac, Inc.)*, 139 B.R. 629 (N.D.Tex.1992); *Bullock v. Joe Bailey Auction Co.*, 580 P.2d 225 (Utah 1978); *Hawaii Jewelers Ass'n. v. Fine Arts Gallery, Inc.*, 51 Haw. 502, 463 P.2d 914 (1970); *Bradshaw v. Thompson*, 454 F.2d 75 (6th Cir.1972); and *Diefenbach v. Gorney*, 93 Ill.App.2d 51, 234 N.E.2d 813 (1968) as authority for its interpretation of UCC 2–328.

### 1. The Case Law

In *Dinkel* a Texas debtor, through an authorized agent, purchased twenty automobiles at an auto auction in Montana. The debtor delivered to the seller twenty bank drafts for the automobiles and was permitted to take possession of the vehicles and transport them to Texas. Ten of the drafts were returned unpaid. Shortly thereafter the debtor filed a petition in bankruptcy and the seller commenced an adversary proceeding to determine the bankruptcy estate's interest in the ten vehicles for which the debtor had not paid. The bankruptcy court ruled that where the seller had accepted the debtor's bid, accepted the bank drafts and allowed the vehicles to be delivered before the drafts had cleared the bank, the vehicles were property of the estate. Further, the Court found that because the seller had no security interest, it was an unsecured creditor.

*Dinkel,* 139 B.R. at 632. On appeal to the district court the seller argued, *inter alia,* that (i) under the course of dealing between the parties and the custom and usage of the auto auction industry, ownership of the vehicles did not pass until the seller was paid in good funds and (ii) title did not transfer at the time of delivery due to an explicit agreement between the parties that title would not pass until good funds had been received. *Id.* On appeal the district court found that industry custom would govern the transfer of title if the parties had "explicitly agreed" that such usage of trade would be observed, but that there was no evidence of any such explicit agreement. *Id.* at 634 (citing *Goodpasture, Inc. v. M/V Pollux,* 688 F.2d 1003, 1006 (5th Cir.1982), *cert. denied* 460 U.S. 1084, 103 S.Ct. 1775, 76 L.Ed.2d 347 (1983)). However, *Goodpasture* did not involve an auction sale and appears to stand for the rather unremarkable proposition that under the UCC the "parties may control passage of title as between themselves by contractual agreement." *Goodpasture,* 688 F.2d at 1006.

In *Bullock,* the issue before the Utah Supreme Court was whether there was evidence in the record to support the trial court's finding that a contract of sale was not made. *Bullock,* 580 P.2d at 228. Bullock, through an agent, qualified as a bidder and was the high bidder at an auction of well drilling equipment in California. The equipment was not operable and was left at the auction site. Bullock performed extensive repairs to the equipment and moved it to Utah without objection by the auctioneer. Bullock's financing was delayed and while moving the equipment to Utah he delivered a check to the auctioneer which contained a restrictive endorsement indicating that it was not to be presented for collection until adequate financing was completed. When the check was presented a few days later it failed to clear the bank and the auctioneer sought to reclaim the equipment. The trial court determined that payment was a condition precedent to consummation of the sale, and because Bullock failed to pay and had taken possession of the equipment without permission, no sale had been completed. *Id.* at 227.

In a three to one decision, the Utah Supreme court reversed the trial court, citing UCC § 2–328(2) and holding that a sale by auction is complete "as a matter of law at the fall of the hammer." *Bullock,* 580 P.2d at 228. The opinion states that "[t]he trial judge determined, and specifically set forth in his findings, that payment was a condition precedent to the consummation of the sale ..." *Id.* at 227. However, the majority reversed this finding of fact based solely upon the stipulation of the parties that the equipment had been sold at auction.[15] Accordingly, it appears that the decision in *Bullock* either supports the proposition that UCC § 2–328(2) controls the transfer of title in an auction sale, a result which cannot be varied by an explicit agreement of parties, or that the evidentiary record did not support the trial court's factual findings. If *Bullock* stands for the first alternative, this Court cannot reconcile the decision with *Dinkel* and *Goodpasture.* If *Bullock* stands for the second alternative, then it is consistent with the other cases discussed herein.

The issue in the *Hawaii Jewelers* case was whether the defendant needed to be

---

**15.** In dissent, Justice Crockett stated that the trial court could have justifiably found, as it did, that there was an unexpressed condition precedent that there was no sale until payment was made. *Bullock,* 580 P.2d at 229 (Crockett, J., dissenting). In his view, the majority ignored fundamental rules of review by not entitling the trial court's decision to a presumption of correctness. *Id.*

licensed as an auctioneer under state law in order to conduct its business. *Hawaii Jewelers*, 463 P.2d at 914. The defendants contended that their thirty-day money back guarantee on sales postponed the transfer of title to consumer purchasers and, therefore, they were not conducting an auction under UCC § 2–328. After acknowledging that there are situations where title was not transferred at the fall of the hammer at an auction, the court found that the intent of the defendant and its customers was to transfer title at the sale with the money back guarantee merely giving the buyer the right to return. *Id.* at 915–16. Therefore, title transferred at the fall of the hammer and the defendant was required to obtain an auctioneers' license. Thus the decision in the *Hawaii Jewelers* case stands for the proposition that the intent of the parties can control when title passes in an auction sale, a result consistent with the *Dinkel* decision.

In *Bradshaw*, a horse was offered at auction, the buyer's high bid was accepted and the horse was led from the ring. The sale catalogue contained in bold type a statement of the customary practice at such auctions, namely that the owner of the horse had the "privilege of no sale if they do not wish to sell for the last bid on the animal, however, [they must] let it beknown [sic] before leaving the ring." *Bradshaw*, 454 F.2d at 80. The morning following the sale, before the title papers had been executed and delivered to the buyer, the owner instructed the auctioneer not to complete the sale. The seller argued that title did not pass until the customary title papers were executed and delivered. The court rejected this argument and held that once the explicit terms of the auction sale were completed (i.e. acceptance of a high bid and leading the horse from the ring) the delivery of the title

papers was not necessary to pass title. *Id.* at 81. The *Bradshaw* decision stands for the proposition that explicit terms which vary the passing of title from the general rule of UCC § 2–328 will be enforced, but additional terms, even those customary in the relevant industry, will not be implied in an auction sale.

In *Diefenbach*, a buyer purchased at auction approximately 2,500 bales of hay from a tenant farmer. *Diefenbach*, 93 Ill. App.2d 51, 234 N.E.2d 813. The terms announced at the sale were "cash before removal." After the gavel had fallen, the buyer notified the seller that he only had part of the purchase price. The buyer was permitted to remove a number of hay bales equal to the partial payment made. Several months later the buyer returned to pick up the rest of the hay and found it gone. The trial court found that neither party knew what had happened to the hay.[16] The trial court entered judgment for the seller against the buyer. The buyer argued on appeal that the tender of delivery was to be simultaneous with payment. However, there was no evidence of any such agreement. The appellate court found that "from the very early history of Illinois, a distinction was recognized in sales at auctions, especially in farm sales where the goods sold are standing ready for removal." *Id.* at 814. Citing a number of pre-UCC cases the court concluded that "[t]he rule has now become statutory by reason of adoption of the Uniform Commercial Code ..." *Id.* Similar to the decision in *Bradshaw* the court in *Diefenbach* refused to imply delivery or title terms at an auction sale. It also appears that the decision may have been based upon long-standing common law in Illinois pertaining to the sale of farm products. No evidence or arguments have been presented that

16. The seller was no longer a tenant farmer at that location.

any such pre-UCC law existed in Vermont. In any event, the *Diefenbach* decision is consistent with the *Bradshaw* opinion.

### 2. Application of the Law to the Facts of the Case

█ AOC contends that: (1) because the Article 9 foreclosure sale was conducted as an auction, UCC § 2–328, rather than UCC § 2–401, applies; (2) because neither the notice of sale nor any terms announced at the auction explicitly established that additional documents (i.e., a bill of sale) or anything else, such as payment of the balance of the bid price, was necessary prior to completing the sale, title to the goods auctioned passed to Hotchkiss, as agent for AOC, with the fall of the hammer as a matter of law under UCC § 2–328; and (3) because title transferred to AOC on September 9, 2002, none of the auctioned goods are property of the estate under 11 U.S.C. § 541. The Court agrees with AOC on its first contention, but disagrees with its interpretation of UCC § 2–328.

█ UCC § 2–328 establishes several rules of law applicable to sales by auction. Subsection 2 provides that "[a] sale by auction is complete when the auctioneer so announces by the fall of the hammer or in other customary manner." In the absence of statutory language to the contrary, the provision regarding the timing of the passage of title may be varied by agreement of the parties. UCC § 1–102(3); *National Heater Co., Inc. v. Corrigan Co. Mech. Contractors, Inc.*, 482 F.2d 87, 90 (8th Cir.1973) (stating that provisions of Code may be varied by agreement); *Mitchell Buick & Oldsmobile Sales, Inc. v. McHenry Sav. Bank*, 235 Ill.App.3d 978, 176 Ill. Dec. 662, 601 N.E.2d 1360 (1992) (holding

that parties may vary effect of Uniform Commercial Code by agreement).

█ AOC does not dispute this provision of the UCC. Rather, AOC contends that any agreement that varies the timing of the passage of title from the general rule of UCC § 2–328(2) must be explicitly stated in the notice of sale or announced at the auction. However, the plain language of the statute does not support that contention. *See* UCC § 2–328. UCC § 2–328(2) is silent regarding the manner for making agreements regarding the passage of title. The Court notes that in the very next subsection the statute provides that an auction "sale is with reserve unless the goods are in *explicit terms* put up without reserve." UCC § 2–328(3) (emphasis added). This difference suggests that the drafters of the UCC knew how to require "explicit terms" and chose not to do so with respect to agreements altering the rule under UCC § 2–328(2).

Auction sales usually do not involve the level of negotiations which accompany many contracts for the sale of goods.[17] At a sale by auction, the announcement of the terms for an auction is not considered an offer by the seller, but merely a proposal. *United States v. Conrad*, 619 F.Supp. 1319, 1321 (M.D.Fla.1985) (finding that it has long been settled that a bid constitutes an offer and the fall of the hammer signifies acceptance). In general, a contract for the sale of goods may be made in any manner which reflects an agreement between the parties, including conduct which recognizes the existence of a contract. UCC § 2–204(1); *In re S.N.A. Nut Co.*, 247 B.R. 7, 17 (Bankr.N.D.Ill.2000) (holding that under the UCC contracts may be made in any manner sufficient to show agreement); *Zamore v. Whitten*, 395 A.2d 435, 443 (Me. 1978) (stating that the UCC has a liberal

---

**17.** The Court notes that AOC did not argue that the general principals of contract forma-

tion applicable under the UCC are not applicable to a sale by auction.

approach to formation of contracts). Conduct of the parties which recognizes the existence of a contract is sufficient to establish a contract. UCC § 2–207(3); *Investment Serv. Co. v. Roper,* 588 F.2d 764, 767 (9th Cir.1978) (finding that under the UCC, a court may find a contract for the sale of goods as the result of conduct of the parties; also, the court can find other types of contracts implied from the intent and conduct of the parties); *Construction Aggregates Corp. v. Hewitt–Robins, Inc.,* 404 F.2d 505, (7th Cir.1968) (holding that the subsequent conduct of parties can establish a contract for sale).

None of the cases cited by AOC compel the conclusion that an agreement to vary the terms of UCC § 2–328(2) requires an explicit term in the notice of auction sale or an explicit announcement at the auction itself. The court in *Dinkel* stated that the course of dealing and the custom and usage of the trade would have applied in a sale by auction if the parties had explicitly agreed. 139 B.R. at 634. However, in that case possession had been transferred against drafts, some of which were not honored by the bank and the court stated that the trial court "could have reasonably concluded that custom and practice of the auction industry is that title passes at the time of delivery of the vehicles." *Dinkel,* 139 B.R. at 634.

In *Bullock,* the court held that there was insufficient evidence of any agreement or custom regarding the passage of title and simply applied the general rule of UCC § 2–328(2).[18] Likewise, *Hawaii Jewelers* involved the application of UCC § 2–328(2) to a situation where the parties had no agreement regarding the timing of the passage of title. In *Bradshaw* the court found the explicit terms of an auction sale,

as stated in the catalogue, controlled over the provisions of UCC § 2–328(2) and refused to imply additional terms to the completion of an auction sale of a horse based upon the later delivery of customary title papers.

Although the cited cases may at first appear to require explicit terms to vary the timing of the passage of title at an auction, upon a careful reading they appear to simply be resolving disputes over such terms by applying the provisions of UCC § 2–328(2) in the absence of any agreement between the parties to vary the statutory terms. This result is not surprising given the dearth of negotiations and evidence of agreement which surround most auction sales. This Court believes that the cases cited by AOC in support of its position are more a result of the evidentiary problems encountered in the vast majority of such cases in proving an agreement between the parties absent an explicit agreement than an expression of policy or statutory interpretation.

■ This case may be the exception to the general evidentiary rule. The parties submitted substantial evidence surrounding their understanding of the terms of the auction. Clauson testified that he understood that ownership and the right to possession of the goods sold would not pass to Hotchkiss until Hotchkiss had paid the balance of the purchase price and Clauson delivered a bill of sale. Tr at page 27, lines 121–25 and page 8, lines 12—20. The letters written by Hotchkiss appear to confirm this understanding. Shortly after the auction Hotchkiss listed a number of detailed "closing requirements" and confirmed his intent to deliver the balance of the purchase price forthwith. *See* Exhibit

---

**18.** As noted in subsection 1 above, the dissent in *Bullock* contended that the trial court had found such an agreement. However, the ma-jority held that the evidence did not support such finding.

102. When he received no response, Hotchkiss sent another letter to Clauson enclosing three checks intended to pay the balance of the purchase price and enclosed a proposed bill of sale. *See* Exhibit 3. On the same day that he delivered the three checks to Clauson, Hotchkiss sent a letter to the lessor of the Debtor's offices enclosing a rent check for the next two weeks in which he stated that "I have completed the purchase of all of [the Debtor's] assets *this afternoon.*" *See* Exhibit 105 (emphasis added).

Based upon the evidence stipulated by the parties, this Court finds that Hotchkiss, and therefore AOC, understood at the time his bid was accepted that the sale of the auctioned goods was not complete until at least the delivery of the balance of the purchase price and that the seller also understood when the bid was accepted that the sale would not be complete until the delivery of the balance of the price and a bill of sale. Therefore, both parties understood and formed an agreement enforceable under the UCC that the sale was not complete until the balance of the purchase price was paid, even in the absence of an express statement of that understanding. Their agreement changed the general rule under UCC § 2–328(2) regarding the timing of the transfer of title. For the reasons discussed below, the Court need not decide whether the parties agreed that the delivery of a bill of sale, or other documents, was required in order to complete the sale.

### B. Tender of the Balance of the Purchase Price.

■ The evidence is undisputed that (1) the buyer properly delivered a deposit at the conclusion of the auction on Monday, September 9, 2002; (2) on Friday, September 13, 2002, the buyer delivered three checks to the seller's attorney in payment of the balance of the purchase price; (3) on Monday, September 16, 2002, the seller's attorney advised the buyer that one of the checks in the amount of $130,000.00, or thirty-three percent of the purchase price, could not be negotiated by the seller and was not acceptable; and (4) the buyer did not replace the rejected check prior to Friday, September 20, 2002, when all money paid by the buyer was returned to him. *See* Exhibits 3, 109 and 110. Under the terms of the notice of sale the balance of the purchase price was due within ten days or September 19, 2002. *See* Exhibit 101. If the checks delivered to the seller's attorney on September 13, 2002 was proper tender of the balance of the purchase price, then subject to any agreement requiring delivery of a bill of sale or other documents, the auction sale was complete on that date and title passed to the buyer. If the tender was not proper, then title did not transfer to the buyer prior to the petition date, September 16, 2002, and upon expiration of the ten-day period for delivery of the balance of the purchase price, the buyer no longer had any rights in the goods sold.

UCC § 2–511 provides:

(2) Tender of payment is sufficient when made by any means or in any manner current in the ordinary course of business....

(3) ... payment by check is conditional and is defeated as between the parties by dishonor of the check on due presentment.

AOC argues that the UCC has adopted a flexible standard based on commercial reasonableness and the only issue for the Court is whether tender of a check payable to the Debtor for one-third of the purchase price is "commercially reasonable" under UCC § 2–511(2). The Court agrees.

Even though the deposit check delivered at the time the bid was accepted at auction

and was payable to the seller, Heath, AOC contends that tender of a check for a substantial portion of the balance of the bid price payable to the Debtor was commercially reasonable because the buyer had no reason to believe that such a check was not acceptable. The Court simply does not understand this argument. In effect, AOC is claiming that delivery of a check payable to someone other than the seller, the seller's agent or the auctioneer, in the absence of any direction by or agreement with the seller, is commercially reasonable. AOC cites no authority for this proposition.

Instead, AOC argues that the check was a bank check, so that there could be no question about its collectability. Of course, even if collection of a check is assured, the recipient of the check must be able to negotiate the check to receive the funds. AOC responds that the seller was the president and a director of the Debtor and, therefore, had full authority to endorse the check on behalf of the Debtor. However, there is no evidence in the record to establish that Heath, as seller, had such authority. Moreover, even if Heath did have such authority, his attorney, Clauson, put Hotchkiss on notice that the check was in excess of the amount which would be due to the Debtor after the sale because of the existence of other secured creditors. At that point it should have been clear to Hotchkiss that the tender was unacceptable. Even after Hotchkiss was notified of the defective tender, under the terms of sale, he had three days remaining within which to correct the tender or seek additional time to procure a proper tender. *See* UCC § 2–511(2). There is no evidence that Hotchkiss took any action after Clauson advised him that his tender was rejected.

## IV. CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court finds that the parties in fact agreed that the auction sale would not be complete until the buyer paid the balance of the purchase price within the ten days specified in the notice of sale and that the buyer did not properly tender the balance of the purchase price within the ten-day period. The Court shall enter a separate order denying the SJ Motion and granting the Injunction Motion.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate judgment consistent with this opinion.